Howard T. KREISNER, et al., Plaintiffs–Appellants,

v.

CITY OF SAN DIEGO, Defendant–Appellee.

No. 90–55354.

United States Court of Appeals, Ninth Circuit.

Argued April 3, 1991.

Submission Deferred April 3, 1991.

Submitted Feb. 19, 1993.

Decided March 3, 1993.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 2, 1993.

Michael A. Jacobs, John F. Delaney, Susan St. Amour, Morrison & Foerster, San Francisco, CA, for plaintiffs-appellants.

Mary Kay Jackson, Deputy City Atty., San Diego, CA, for defendant-appellee.

Before: BOOCHEVER, KOZINSKI, and O'SCANNLAIN, Circuit Judges.

## ORDER

The majority opinion filed on March 3, 1993 is amended as follows:

[Editor's Note: Amendments have been incorporated into published opinion.]

A majority of the panel voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc. Judge Boochever would grant the petition for rehearing and recommended acceptance of the suggestion for rehearing en banc.

The full court was advised of the en banc suggestion. An active judge of the court requested an en banc vote. The case failed to receive a majority of the votes of the non-recused active judges. Fed.R.App.P. 35. With the above amendments, the petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.

## *OPINION*

O'SCANNLAIN, Circuit Judge:

This appeal squarely presents a conflict between two of our most deeply cherished liberties: freedom of speech and freedom of religion. The question we must decide is whether the City of San Diego may, consistent with the Establishment Clause of the United States Constitution, permit a private group to erect a religious display in a public park during the Christmas season. Because the park is a traditional public forum removed from the seat of government, we hold that the City may permit the display provided it does so in a non-discriminatory manner.

I

San Diego's Balboa Park is a 1200–acre public park containing recreational facilities ranging from theatres, museums, and a zoo to picnic areas and sporting fields. Every year during the Christmas holiday season, Balboa Park is the site of a holiday display. The City, in conjunction with a private non-profit group known as the Community Christmas Center Committee ("the Committee" or "the Christmas Committee"), sponsors a secular holiday display, which includes a Santa Claus, reindeer, a Christmas tree,

and numerous festive colored lights. That display is not challenged here.

Some 250 feet away from the secular display, and partially separated from it by a wall and a road, is a small, open-air amphitheatre known as the Organ Pavilion. Each year, the Christmas Committee is granted a permit to set up a display consisting of scenes from the New Testament in the Organ Pavilion. The Committee's display, which remains in place for approximately six weeks from late November through early January, includes eight scenes, four of which are placed on each side of the Pavilion's stage. Each scene is housed in a palm-covered booth ten feet high and fourteen feet wide. Each contains life-size statuary depicting a biblical scene from the life of Christ, a painted backdrop, and a descriptive sign. Seven of the eight scenes also include gospel passages in English and Spanish. As described by the signs, the eight scenes and their accompanying biblical passages are as follows:

| *Scene* | *Biblical Quotation* | |
|---|---|---|
| The Annunciation | "Fear not Mary: for thou hast found favour with God; and behold, thou shalt bring forth a son, and shalt call his name Jesus." | |
| | | Luke 1:30–31 |
| [no description; Mary and Joseph being turned away from the inn.] | "there was no room for them at the Inn." | |
| | | Luke 2:7 |
| Angel appearing before the shepherds | "The shepherds said, let us now go . . . and they came with haste and found both Mary and Joseph, and the babe lying in a manger." | |
| | | Luke 2:15–16 |
| The birth of Christ | [text does not appear in record] | |
| Wise Men on their way to Bethlehem | "Behold, wise men from the east came to Jerusalem saying, Where is he that is born King of the Jews? . . . for we are come to worship him." | |
| | | Matt. 2:1–2 |
| The Flight into Egypt | "Arise and take the young child and his mother, and flee into Egypt, for Herod will seek the young child to destroy him, and Joseph took them by night." | |
| | | Matt. 2:13–14 |
| Christ in the Temple Suffer the little children to come unto me | [no text] "But Jesus said, Suffer the little children to come unto me, and forbid them not; for to such belongeth the Kingdom of God." | |
| | | Mark 10:14 |

One or more disclaimer signs, stating that the Biblical display is privately sponsored and not allied with the City, accompany the display. The record does not reveal the size, text, or location of these disclaimers.

The Committee pays no fee for its use of the Organ Pavilion. The City ordinarily charges organizations who wish to reserve the Pavilion for exclusive use a fee varying from $440 to $1,325 per day, depending upon the nature of the use and the user. City regulations allow waiver of these fees for nonprofit community services organizations, defined as "recognized group[s], club[s], agenc[ies] or organization[s] whose activities are of a service or character building nature, who give service to the community as a whole, and ... where no portion of the net earnings are used for or inure to the benefit of any individual or member of the group."

The City explains that it charges no fee for the Committee's display because the Committee's use of the Organ Pavilion is "non-exclusive." Other groups and individuals can and do use the Pavilion while the display is in place. The City represents that, if another user so requests, it will require the Committee to cover the display while any overlapping exclusive use permit is in effect.

The Committee's Biblical display has been an annual tradition in Balboa Park since 1953. The Committee has always owned the statuary and booths. Before 1988, the display was erected and removed each year by City employees, and stored on City property.

In the wake of an opinion issued by the City Attorney to the effect that the City's involvement was unconstitutional, the Committee now erects, removes, and maintains the display itself, and stores it on private property. The Committee reimburses the City $150 for the estimated cost of electricity used by the display. The City provides no other services in connection with the display.

To help defray the costs of the display, the Committee maintains donation barrels at the site. It also maintains a stock of small pamphlets, which contain a schedule of concerts and events to be held at the Pavilion during the Christmas season, a brief history of the Christmas Committee, and a plea for donations to support the Committee's activities.

■ Acting pro se, appellant Howard Kreisner filed suit in the federal district court seeking to prevent the City from allowing the Committee to erect the display on public property. Kreisner alleged that the City's decision to permit the display in Balboa Park violated the religion clauses of both the federal and state constitutions. His complaint requested declaratory and injunctive relief, as well as punitive and other damages.[1]

The parties agreed that no material facts were in dispute, and submitted cross motions for summary judgment. On November 8, 1989, Judge Enright granted judgment for the City on the federal claim and dismissed the state claim.[2] This timely appeal fol-

---

**1.** Kreisner has standing to bring this action based on his allegation that the challenged display interferes with his right to use Balboa Park. *See Hewitt v. Joyner,* 940 F.2d 1561, 1564 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); *ACLU v. City of St. Charles,* 794 F.2d 265, 268 (7th Cir.), *cert. denied,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *ACLU v. Rabun County Chamber of Commerce,* 698 F.2d 1098, 1107–08 (11th Cir.1983). Because this injury is sufficient to establish standing, we need not consider whether Kreisner would have standing as a municipal taxpayer. *See Cammack v. Waihee,* 932 F.2d 765, 770–72 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992).

**2.** In his supplemental brief following our limited remand, Kreisner attempted to resurrect his state constitutional claim. Because he failed to chal-

lenge the district court's dismissal of that claim in his opening and reply briefs on appeal, we deem the issue waived and decline to address it. *See In re Riverside–Linden Inv. Co.,* 945 F.2d 320, 324 (9th Cir.1991). Nor can our remand order fairly be read to authorize the district court to consider issues not raised in the briefs. In any event, *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) teaches us that a state's interest in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution is limited by the Free Exercise Clause and the Free Speech Clause as well. *Widmar,* 454 U.S. at 276, 102 S.Ct. at 277. Thus, even though the California Constitution's provision prohibiting governmental establishment or preference of religion may be broader than the United States Constitution, *see Hewitt v. Joyner,* 940 F.2d 1561, 1567 (9th Cir.1991), it, like the Establishment

lowed. This court appointed counsel to represent Kreisner on appeal.

After the appeal was argued before this panel, it became obvious that the parties disagreed about the nature of the City's permit policy in Balboa Park. They submitted competing declarations and affidavits describing the policy to us. To resolve the dispute, we remanded to the district court for entry of factual findings.[3] The district court (Judge Huff, following Judge Enright's recusal) held a hearing and determined that the City followed a first-come, first-served policy in Balboa Park. Judge Huff also reaffirmed Judge Enright's conclusion of law that permitting the display on public property did not violate the Establishment Clause of the United States Constitution.

We solicited additional briefing from the parties, and postponed submission pending the decision of the Supreme Court in *Lee v. Weisman,* —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). We now affirm.

## II

### A

The First Amendment provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. Although written as a limitation upon congressional power, this clause also operates, through the Fourteenth Amendment, to constrain the power of state governments. *See Everson v. Board of Educ.,* 330 U.S. 1, 8, 67 S.Ct. 504, 507, 91 L.Ed. 711 (1947).

Clause of the Federal Constitution, must be limited by the Free Exercise Clause and the Free Speech Clause. *Widmar,* 454 U.S. at 276, 102 S.Ct. at 277.

3. The dissent states that because we are reviewing the district court's grant of summary judgment we should view the evidence in the light most favorable to Kreisner, rather than adopt the findings of fact of the district court. The dissent relies on *Swarner v. United States,* 937 F.2d 1478 (9th Cir.1991). But garden variety summary judgment cases, like *Swarner,* are far different from this one. Here, our remand order stated: Specifically, the district court shall determine what are the policies of the City of San Diego with respect to granting permits for the use of Balboa Park. On remand, the district court

Like most cherished social values, the principle of religious freedom that is embodied in the Establishment Clause is easy to proclaim but difficult to define: "Candor compels acknowledgment ... that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). The Supreme Court has, however, generally articulated the boundaries of the Clause's coverage. In a world of constant compromise and qualification, the Establishment Clause

means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.

*Everson,* 330 U.S. at 15–16, 67 S.Ct. at 511–12 (quoting *Reynolds v. United States,* 98 U.S. 145, 164, 25 L.Ed. 244 (1879)). Or, more succinctly put:

In the course of adjudicating specific cases, [the Supreme Court] has come to understand the Establishment Clause to

made findings of fact after holding an evidentiary hearing and taking testimony in open court. *See* Findings of Fact and Conclusions of Law 52 C.R. at 2–3. Although he objected to the nature of the district court's findings, Kreisner did not object to our remand order or to the holding of an evidentiary hearing, nor is there any indication that he did not have sufficient notice to present his case. Considering the extent of the hearings below and our earlier order focusing the district court's efforts, there is no reason to depart from the clearly erroneous standard of review that we apply to findings of fact following an evidentiary hearing. *Carter v. McCarthy,* 806 F.2d 1373, 1375 (9th Cir.1986) (findings of fact made after evidentiary hearing reviewed under the clearly erroneous standard).

mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.

*County of Allegheny v. ACLU ("Allegheny County")*, 492 U.S. 573, 590–91, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472 (1989).

On the other hand:

The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow.

*Lee v. Weisman*, —— U.S. at ——, 112 S.Ct. at 2661 (quoting *Abington School District v. Schempp*, 374 U.S. 203, 308, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring)). The Constitution "permits government some latitude in recognizing and accommodating the central role religion plays in our society." *Allegheny County*, 492 U.S. at 657, 109 S.Ct. at 3135 (Kennedy, J., concurring and dissenting).

Applying these general tenets in the context of a particular case "remains a delicate and fact-sensitive" task. *Lee v. Weisman*, —— U.S. at ——, 112 S.Ct. at 2661.

In each case, the inquiry calls for line-drawing; no fixed, *per se* rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. The purpose of the Establishment Clause "was to state an objective, not to write a statute."

*Lynch v. Donnelly*, 465 U.S. 668, 678, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 671, 90 S.Ct. 1409, 1413, 25 L.Ed.2d 697 (1970)).

In the context of religious holiday displays, the Court's Establishment Clause jurisprudence has been particularly factbound. No clear general principles emerge from the two most recent cases considering the constitutionality of such displays. In *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Court found no Establishment Clause violation in the City of Pawtucket's ownership and annual display of holiday decorations including, among other things, a Santa Claus, a Christmas tree, and a Nativity scene. The display was located in a privately-owned park in the heart of the City's shopping district. In *Allegheny County*, a deeply divided Court held unconstitutional the display of a privately-owned creche on the "Grand Staircase" of the County courthouse, but permitted a second privately-sponsored display consisting of a menorah, a Christmas tree, and a sign saluting liberty outside a government office building a block from the courthouse. Together, *Lynch* and *Allegheny County* call for a detailed contextual inquiry that has been aptly described as "requiring scrutiny more commonly associated with interior decorators than with the judiciary." *American Jewish Congress v. City of Chicago*, 827 F.2d 120, 129 (7th Cir. 1987) (Easterbrook, J., dissenting).

### B

Although the Court has "repeatedly emphasized [its] unwillingness to be confined to any single test or criterion in this sensitive area," *Lynch*, 465 U.S. at 679, 104 S.Ct. at 1362, it has generally applied the three-part test first articulated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to determine whether a challenged practice or statute comports with the Establishment Clause. Moreover, despite criticisms by current members of the Court, *see Lee v. Weisman*, —— U.S. at ——, 112 S.Ct. at 2685 (Scalia, J., dissenting) (cataloging such criticisms), the Supreme Court expressly declined to reconsider the *Lemon* test in *Lee, id.* at ——, 112 S.Ct. at 2655 (opinion of the Court). We therefore see no justification for the dissent's articulation of a new Establishment Clause test.

Even were a new test warranted, the dissent's proposed sliding scale test has what we see as a major flaw: It requires the court to judge the "intensity" of the religious message. This is problematic in a several significant ways. First, an inquiry into the intensity of a religious symbol essentially asks how "central" that symbol is to the faith it represents. For example, is a menorah more intense than a cross? The Supreme Court has disapproved this sort of inquiry in religion cases. *See Employment Division v. Smith,* 494 U.S. 872, 886–87, 110 S.Ct. 1595, 1604, 108 L.Ed.2d 876 (1990) (constructing free exercise test to avoid judicial inquiry into the "centrality" of a practice to a person's faith); *see also Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith. . . ."); *United States v. Lee,* 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982) ("It is not within the judicial function and judicial competence, however, to determine whether appellee or the Government has the proper interpretation of the Amish faith. . . .") (quotation omitted). Second, the dissent's test raises a difficult question of perspective. The dancing Siva, Nataraja, has much religious import to a Hindu, but its significance would be lost on most Americans. From whose perspective do we determine intensity? The reasonable Judeo–Christian observer? There are no judicially manageable standards to apply in making these sensitive judgments. Finally, the likely consequence of the dissent's test would be that only diluted religious messages would be allowed in public forums. Yet *Lee v. Weisman* cautioned against precisely this result:

The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission. It must not be forgotten then, that while concern must be given to define the protection granted to an objec-

tor or a dissenting nonbeliever, these same Clauses exist to protect religion from government interference. James Madison, the principal author of the Bill of Rights, did not rest his opposition to a religious establishment on the sole ground of its effect on the minority. A principal ground for his view was: "[E]xperience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation."

*Id.* at ——, 112 S.Ct. at 2656–57 (citations omitted). In the same way that government-crafted prayers threaten to water down religious messages, permitting only those Christmas displays that are of minimal "intensity" will detract from or destroy their religious significance. The *Lemon* test focuses our inquiry on the objective circumstances—such as its location and sponsorship—that measure the government's involvement in the religious display. The test thus avoids the serious risks associated with judicial scrutiny of the content of the message conveyed.

In our application of the *Lemon* test, we take guidance from *Allegheny County,* 492 U.S. at 592, 109 S.Ct. at 3100, where the Court explained:

Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion.

The challenged practice must survive all three prongs of the *Lemon* analysis in order to pass constitutional muster. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987). Kreisner argues that the City's grant of a permit allowing the Committee to erect its display in Balboa Park violates each facet of the *Lemon* test.

1

■ A government practice or statute fails the purpose prong of *Lemon* if its purpose is to endorse a religious custom or viewpoint. *See Allegheny County,* 492 U.S. at 592, 109

S.Ct. at 3100; *Edwards,* 482 U.S. at 593, 107 S.Ct. at 2582; *Wallace v. Jaffree,* 472 U.S. 38, 60, 105 S.Ct. 2479, 2491, 86 L.Ed.2d 29 (1985). "Government endorsement of religion has been found when the government conveys or attempts to convey a message that a particular religion is favored or preferred, or when it promotes one religion or religious theory against another or even against the militant opposite." *Cammack v. Waihee,* 932 F.2d 765, 773 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992). As Justice O'Connor explained in her concurring opinion in *Lynch:* "The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion." *Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring).

A practice will stumble on the purpose prong "only if it is motivated wholly by an impermissible purpose." *Bowen v. Kendrick,* 487 U.S. 589, 602, 108 S.Ct. 2562, 2570, 101 L.Ed.2d 520 (1988); *Cammack,* 932 F.2d at 774. A reviewing court must be "reluctant to attribute unconstitutional motives" to government actors in the face of a plausible secular purpose. *Mueller v. Allen,* 463 U.S. 388, 394–95, 103 S.Ct. 3062, 3067, 77 L.Ed.2d 721 (1983).

■ We have no difficulty concluding that the City's decision to permit the Committee to erect its holiday display in Balboa Park is supported by a legitimate, sincere secular purpose. The City cites two such purposes: (1) the promotion of holiday spirit and (2) the promotion of free expression. We need not consider the City's first avowed purpose because the second suffices. The Supreme Court has made it clear that a policy of permitting open access to a public forum, including non-discriminatory access for religious speech, is a valid secular purpose. *Board of Education v. Mergens,* 496 U.S. 226, 249, 110 S.Ct. 2356, 2371, 110 L.Ed.2d 191 (1990); *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981).

The City's past sponsorship of the display does not undercut our conclusion. It is undisputed that the City no longer acts as a sponsor. Further, the City has taken affirmative steps to disassociate itself from the Committee and the display. Under the circumstances, the City's past conduct is not persuasive evidence of its current motives.

### 2

Purposes aside, Kreisner contends that the principal and primary effect of granting the Committee's annual request for a permit is to advance one particular religion and its theological viewpoint. The test under this prong is whether "the challenged government action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). The question, in other words, is whether the government's action "actually conveys a message of endorsement" of religion in general or of a particular religion. *Wallace,* 472 U.S. at 69, 105 S.Ct. at 2496 (O'Connor, J., concurring in the judgment).

■ We assume that, were the Committee's display sponsored by the government, its overwhelming message of glorification of the divinity of Jesus Christ would violate the Establishment Clause. Notwithstanding its strong religious content, however, we conclude that because the display is private speech in a traditional public forum removed from the seat of government it does not have the primary effect of advancing religion. We set forth below the reasoning by which we arrive at this conclusion.

### a

Essentially, the question presented here is whether placement of a private, overtly religious holiday display on public property represents government endorsement of religion. The Supreme Court has not yet squarely addressed this issue. *Cf. Allegheny County,* 492 U.S. at 600 n. 50, 109 S.Ct. at 3104 n. 50 (creche display on courthouse staircase does not raise public forum issue). This question was presented but not authoritatively resolved in *Board of Trustees of Scarsdale v. McCreary,* 471 U.S. 83, 105 S.Ct. 1859, 85

L.Ed.2d 63 (1985) (lower court decision holding that city could constitutionally allow private group to display creche in traditional public forum affirmed by an equally divided court). It has divided the circuits. *See Doe v. Small*, 964 F.2d 611 (7th Cir.1992) (en banc) (injunction forbidding display of religious paintings by private organization in public park held overbroad); *Chabad–Lubavitch of Georgia v. Miller*, 976 F.2d 1386 (11th Cir.1992) (per curiam) (private group properly prohibited from erecting menorah on plaza in front of, or in the rotunda of, state capitol building). Even within individual circuits, the answer has not always been consistent. *Compare Kaplan v. City of Burlington*, 891 F.2d 1024 (2d Cir.1989) (holding that permitting private display of menorah in City Hall Park violated Establishment Clause), *cert. denied*, 496 U.S. 926, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990), *with McCreary v. Stone*, 739 F.2d 716 (2d Cir.1984) (holding that village's grant of a permit ·allowing private group to display creche in public park did not violate Establishment Clause), *aff'd by an equally divided court sub nom. Board of Trustees v. McCreary*, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985). Indeed, as Judge Boggs, writing for the Sixth Circuit, noted in *Americans United for Separation of Church and State v. City of Grand Rapids ("Grand Rapids I")*, 922 F.2d 303 (6th Cir. 1990), virtually every panel to consider this issue has found itself divided.

In addressing ourselves to this difficult question, we start from the observation that Balboa Park, a public park which is held open for various expressive activities, is unquestionably a traditional public forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983) (describing public parks as "quintessential public forums"); *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (parks have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"). Religious speakers have the same right of access to public forums as others. *Widmar*, 454 U.S. at 269, 102 S.Ct. at 274; *McDaniel v. Paty*, 435 U.S. 618, 641, 98 S.Ct. 1322, 1335, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring); *O'Hair v. Andrus*, 613 F.2d 931, 935 (D.C.Cir.1979) ("The government may not allocate access to a public place available for communication among citizens on the basis of the religious content of the messages."); *see also Lamb's Chapel v. Center Moriches Union Free School Dist.*, ⸺ U.S. ⸺, ⸺ – ⸺, 113 S.Ct. 2141, 2147–48, 124 L.Ed.2d 352 (1993) (assuming arguendo that school premises constituted limited public forum, concluding that school district violated Free Speech Clause by denying church access to exhibit film solely because of religious subject matter).

It necessarily follows from the fact that Balboa Park, including the Organ Pavilion, is a traditional public forum, that the City may not enforce a content-based restriction on private speech there without a compelling interest, and that any such restriction must be narrowly tailored to achieve that interest. *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. at 954.[4] This means that, absent some compelling state interest, the City cannot forbid the Committee from erecting its display in Balboa Park because of the religious content of the message. The Supreme Court has raised, but never resolved, the question whether avoiding an Establishment Clause violation provides a compelling state interest justifying a content-based restriction on speech in a public forum. *See Widmar*, 454 U.S. at 271, 102 S.Ct. at 275; *see also Lamb's Chapel*, ⸺ U.S. at ⸺, 113 S.Ct. at 2148. The *Widmar* analysis of such a case involves two steps: first, determining whether there is a violation of the Establishment Clause; then, deciding whether avoiding the violation is an interest sufficiently weighty to justify placing restraints on free speech.

---

**4.** *But see Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.*, ⸺ U.S. ⸺, ⸺ – ⸺, 112 S.Ct. 501, 512–15, 116 L.Ed.2d 476 (1991) (Kennedy, J., concurring) (disputing the precedential basis for a compelling state interest balancing test, and arguing for an approach in which all restrictions falling outside recognized categories, such as fighting words or obscenity, are automatically invalidated).

Thus, in this case, we must first decide whether the City's open forum policy, which accommodates the Committee's religious display, violates the Establishment Clause. If it does not, the predicate is lacking for restricting speech in Balboa Park, and the policy will stand. If there is an Establishment Clause violation, we must turn to the (even more difficult) question of whether avoiding that violation provides a compelling state interest that justifies placing a content-based restriction on religious speech in a public forum—a restriction that would otherwise would be forbidden by the Free Speech Clause.

b

In evaluating the effect of the City's grant of a permit to the Committee, we apply the standard of a "reasonable observer." *Allegheny County*, 492 U.S. at 620, 109 S.Ct. at 3115 (opinion of Blackmun, J.). This hypothetical observer is informed as well as reasonable; we assume that he or she is familiar with the history of the government practice at issue, as well as with the general contours of the Free Speech Clause and public forum doctrine. *See Wallace*, 472 U.S. at 76, 83, 105 S.Ct. at 2500, 2503 (O'Connor, J., concurring in the judgment). For purposes of this case, then, we assume that the reasonable observer is aware of Balboa Park's public forum nature and the City's first-come, first-served permit policy. Our observer realizes that the Park and the Organ Pavilion host an eclectic range of uses throughout the year.

In our view, such an observer could not fairly interpret the City's tolerance of the Committee's display as an endorsement of religion. To paraphrase Judge Boggs writing for the en banc court at a subsequent stage of the *Grand Rapids* litigation:

By allowing the display . . . the city merely states that it neither favors nor disfavors religious speech. In fact, [the city] does not even go so far as to "acknowledge" religion by permitting the [biblical] display; it merely sends a message that reli-

gious groups will be treated no worse than others. Anyone familiar with [Balboa Park] soon realizes that many groups use it, and that none of these groups receives special treatment from [the city].

*Americans United for Separation of Church and State v. City of Grand Rapids ("Grand Rapids II")*, 980 F.2d 1538, 1545 (6th Cir. 1992) (en banc). *See also O'Hair*, 613 F.2d at 935 ("When the National Mall is, as a matter of established policy, openly available on a non-discriminatory basis to the Pope, to the Reverend Moon, to Madalyn Murray O'Hair, and to *all* others (religionists and anti-religionists), there is no 'establishment of religion,' and there cannot be a meaningful perception of one.").[5] Because Balboa Park is a traditional public forum, we conclude that San Diego conveys no message of endorsement by allowing the Christmas Committee to display its biblical booths there.

Again, the City's past sponsorship of the display does not mandate a different conclusion. We will not punish the Committee for the City's past mistakes. "Neither official disfavor nor the rebound effect of official approbation can make a difference when the Constitution puts choice in private hands. A blunder by public officials cannot restrict the scope of private speech." *Doe v. Small*, 964 F.2d at 629 (Easterbrook, J., concurring).

We reject Kreisner's contention that public forum doctrine does not apply here because the Organ Pavilion is not a public forum for large unattended displays. This argument misperceives the nature of Balboa Park, which is a traditional public forum, not a public forum by designation. Designated public forums are areas opened and designated by the state for expressive activity. *Cornelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). Access to such designated public forums may be restricted "to the original recipients of the government's permission and to entities similar in character." *Monterey County Democratic Central*

---

5.  In concluding that San Diego has not endorsed the Committee's religious views by allowing it to erect its display in the Organ Pavilion, we do not rely upon the details of the disclaimer sign, which do not appear in the record. We empha-

size, however, that the presence of such a sign, while not dispositive, reinforces the reasonable observer's perception of no government sponsorship.

*Comm. v. United States Postal Serv.*, 812 F.2d 1194, 1196 (9th Cir.1987). Thus, if Balboa Park were a designated public forum, the fact that the City permitted certain types of expressive activity there would not require it to permit other forms of speech, such as large unattended displays. Traditional public forums, such as parks and public streets, however, are open to all manner of speech, subject only to reasonable time, place, and manner restrictions. No affirmative government action is required to open a traditional public forum to a specific type of expressive activity.

In fact, we have grave doubts about the City's ability, should it so choose, to withdraw the Organ Pavilion from its status as a traditional public forum. *See United States v. Grace*, 461 U.S. 171, 180, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983) (traditional public forum does not lose its historically protected character because of proximity to other property, or by governmental *ipse dixit* ). In any event, the City has made no such effort to limit uses of the Organ Pavilion. The record before us provides no indication that the City has treated the Organ Pavilion as anything other than a traditional public forum. The Pavilion is open to use by a wide variety of persons for a wide variety of purposes throughout the year. In the absence of any evidence that the City has closed Balboa Park or the Organ Pavilion to large unattended displays, we assume it has not. *Cf. Doe v. Small*, 964 F.2d at 619 (plaintiff bears burden of proving that government denies access to public forum). Accordingly, we reject Kreisner's argument that the Organ Pavilion is not a public forum for large unattended displays.

Kreisner relies on *Kaplan*, 891 F.2d at 1029, in which the Second Circuit held that allowing the private display of a menorah in City Hall Park would violate the Establishment Clause in part because "prior to the grant of the permits for the display of the menorah, [the City] had not created a forum in City Hall Park open to the unattended, solitary display of religious symbols." We do not find *Kaplan*'s reasoning persuasive in the context of a traditional public forum such as Balboa Park. The mere fact that no other

speaker in Balboa Park, so far as the record reveals, has chosen the medium of an unattended display cannot justify a rule of law that would force the City to forbid such displays based upon their religious content. *Cf. Kaplan*, 891 F.2d at 1032 (Meskill, J., dissenting) ("The park's status as a public forum does not depend upon whether the City has in the past permitted a particular type of speech or form of expressive conduct."). We refuse to place the burden on the City of showing that a traditional public forum is open to any particular form of speech. Rather, we think the burden must be on Kreisner to show that the City has *closed* the forum to large displays other than the Committee's. This burden has not been met.

Nor are we persuaded that under our interpretation the "public forum doctrine would swallow up the Establishment Clause." *Kaplan*, 891 F.2d at 1029. Public forum or not, the Establishment Clause limits the ability of government to engage in or to support religious speech. The City may not sponsor the Committee's display, or render preferential treatment to the Committee. *See Berger v. Rensselaer Central School Corp.*, 982 F.2d 1160, 1166 (7th Cir.1993) (government "officials cannot retain discretion over content on the one hand and on the other pretend to be manacled by the dictates of content neutrality"). However, the Committee, like other citizens of diverse views, has the right to express its views publicly in areas traditionally held open for all manner of speech. Tolerance of religious speech in an open forum "does not confer any imprimatur of state approval on religious sects or practices." *Widmar*, 454 U.S. at 274, 102 S.Ct. at 276. "Thus, ... truly *private* religious expression in a truly *public* forum cannot be seen as endorsement by a reasonable observer." *Grand Rapids II*, 980 F.2d at 1553 (emphasis in original). Indeed, exclusion of religious groups from a forum otherwise open to all would demonstrate government hostility to religion rather than the neutrality contemplated by the Establishment Clause. *Mergens*, 496 U.S. at 228, 110 S.Ct. at 2360.

The dissent makes much of the fact that "the property on which the display rests is

owned and maintained by San Diego's taxpayers" and "the property is adorned with structural symbols of government," Dissent at 1739, but we are at a loss to understand the significance of these assertions. By its nature, a public forum will be on land owned by the government. *See Lloyd Corp. v. Tanner*, 407 U.S. 551, 569, 92 S.Ct. 2219, 2229, 33 L.Ed.2d 131 (1972) (private shopping center not a public forum).[6]

In part because Balboa Park houses some "structural symbols of government," the dissent believes a reasonable observer would think the Christmas Committee display was endorsed by the government. To support this argument the dissent lists the following structural symbols: "the United Nations Building, the Hall of Nations, the House of Pacific Relations, the Museum of Man, the San Diego Museum of Art, the Space Theater and Science Center, and the Natural History Museum." Dissent at 1739. We have found nothing in the record which discloses the relationship of any of these buildings to the City of San Diego; the complaint contains no allegations as to them. However, even if we assume they are owned or operated by the city, they appear to have nothing to do with functions associated with the seat of government. Rather, consistent with the nature of Balboa Park itself, they involve cultural and recreational activities unrelated to core governmental functions.

In any event, even the proximity of buildings of unmistakably governmental character is a patently imperfect proxy for attributing speech that goes on there to the government. The White House, perhaps the most visible structural symbol of our government, borders Lafayette Square in Washington, D.C., yet the square itself has consistently been upheld as a public forum. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Places that are near government buildings— where many people pass and have occasion to hear the speaker—are prime territory for the exercise of First Amendment rights. *See United States v. Kokinda*, 497 U.S. 720, 736, 110 S.Ct. 3115, 3125, 111 L.Ed.2d 571 (1990) (Kennedy, J., concurring) ("As society becomes more insular in character, it becomes essential to protect public places where traditional modes of speech and forms of expression can take place."). It seems axiomatic to the public forum principle that we view messages expressed there as those of the actual speakers. The public forum doctrine would be rendered meaningless if only places in the middle of nowhere could be free speech areas, and if all speech that occurred near "structural symbols of government" had to be viewed as government speech. The dissent treats this as another creche-on-the-courthouse-steps or menorah-in-the-capitol-rotunda case, which it clearly is not.

We simply are not called upon to decide here whether a private religious display located in a public forum closely associated with the seat of government might be constitutionally infirm.[7] Balboa Park, and in particular the Organ Pavilion where the Committee's display is located, is neither physically surrounded by nor intimately associated with the trappings of government. While Balboa Park may be a well-known San Diego

---

6. Whether certain types of government property are public fora has sharply divided the Court, *see, e.g., International Soc'y for Krishna Consciousness v. Lee*, —— U.S. ——, 112 S.Ct. 2711, 120 L.Ed.2d 541 (1992); *Cornelius v. NAACP Defense and Educ. Fund, Inc.*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), but thus far the Court has only reaffirmed the description of public fora that gave rise to the doctrine: "Wherever the title of streets and *parks* may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (emphasis added).

7. *See, e.g., Kaplan*, 891 F.2d at 1025 (holding permit for private display of religious symbol in traditional public forum in front of seat of city government violative of Establishment Clause); *Smith v. County of Albermarle*, 895 F.2d 953, 955 (4th Cir.), *cert. denied*, 498 U.S. 823, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990) (nativity scene could not be placed in public forum on front lawn of county office building by private group; determinative factor that "one could not readily view the creche without also viewing the trappings and identifying marks of the state"); *but see Kaplan*, 891 F.2d at 1033 (Meskill, J., dissenting) (park does not lose its status as a traditional public forum "merely because City Hall is located on one side" of it).

landmark, it is not the equivalent of City Hall or a city office building.

c

Kreisner argues that, even if the City may issue a permit for the display on a non-preferential basis, as a matter of fact it grants the Committee an unconstitutional preference. We agree with the district court that Kreisner has failed to raise a material issue of fact in this regard. The City claims that its policy is first-come, first-served, regardless of the identity of the speaker or the content of the speech.[8] Kreisner is unable to point to any facts undermining that claim.[9]

A first-come, first-served policy, such as that employed by San Diego, is a valid means for regulating the use of a public forum. Such a policy does not vest impermissible discretion in any official. *See Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640, 649, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981).

Nor do we find it significant that the City's first-come, first-served policy is not memorialized in the form of a written regulation.

> In the absence of any allegation (much less actual proof) that [San Diego] has denied any person access to the Park, it is immaterial that [San Diego] does not have an officially stated policy of equal access, for the Constitution mandates that religious speakers may not be discriminated against in a public forum on the basis of their speech. The City of [San Diego] is required to comply with the constitutional

mandate regardless of whether it has an officially stated policy of doing so, and [Kreisner] has failed to demonstrate non-compliance.

*Doe v. Small*, 964 F.2d at 619.

d

Kreisner further contends that, even if the City has not violated the Constitution by permitting the display in the Organ Pavilion, it has done so by: (1) allowing the Committee to solicit donations; and (2) failing to charge a fee for the Committee's use of the Organ Pavilion.

i

■ Does permitting the Christmas Community Center to solicit donations at the site—through its bins and pamphlets—have the impermissible effect of both endorsing and supporting a particular sectarian viewpoint? The regulations governing park use state that "[t]o solicit funds is prohibited by City Ordinance." The definition of "solicitation" in the municipal code includes "[a]ny direct oral or written request for money, property or anything of value or any financial assistance of any kind," as well as "[t]he distribution ... of letters, posters, handbills, cards, folders, pamphlets, books, or circulars for the purpose of soliciting funds." San Diego Municipal Code section 57.01B(a), (b).

The Committee keeps a stock of pamphlets, which entreat visitors to "Help Us Keep the Community Christmas Center Go-

---

8. At oral argument, the City represented to this court that any person could get a permit to place an unattended display in any part of the park, regardless of the content of the display, on a first-come, first-served basis. The City further represented that no fee would be charged for such a display. Having made these representations, the City is now bound by them.

We hold here that Kreisner has failed to demonstrate that the City does not abide by its stated open-access policy. Should the City at any time fail to comply with that policy, a wrongfully excluded group may of course bring suit.

9. After oral argument in this court, amicus ACLU attempted to "test" the City's permit procedures. Amicus sent an employee to the City's Parks and Recreation Department to request a permit for use of the Organ Pavilion in December 1991 for

a display celebrating the bicentennial of the Bill of Rights. The ACLU had no intention of erecting such a display, and the employee was accordingly unable to supply the City with needed details concerning the size of the display. The City declined to issue the permit without such details, which were never provided. This little vignette in no way suggests that the City's claimed open-access policy is a sham.

Nor does it, as Kreisner now insists, cast doubt upon the district court's grant of summary judgment. A litigant who has been unable to demonstrate material issues of fact prior to an adverse decision cannot thereafter create such issues by his own behavior. Moreover, Kreisner affirmatively declared below that the case was ripe for summary judgment. We will not allow him to withdraw that concession based on his dissatisfaction with the court's ruling.

ing!," at the display. The pamphlets request that checks be made out to the Committee, and explain that "[t]o insure the continuing operation of the Christmas Community Center, voluntary contributions are essential." They also point out that gifts are tax deductible. Distribution of these circulars appears to fall within San Diego's definition of "solicitation."

We agree that enforcement of the non-solicitation rule against some groups, but not against others similarly situated, would impermissibly favor some speakers. Nonetheless, on the record before us, we find no Establishment Clause violation. Although Kreisner has amply demonstrated that the Committee is permitted to solicit contributions in the park, he has not demonstrated that anyone else is prevented from engaging in similar solicitation. The City claims that it does not regard the type of request for donations made by the Committee as within the scope of its ordinance.

We decline to assume, in the absence of any evidence, that the City ordinarily attempts to enforce its ordinance to bar this kind of solicitation of charitable contributions. The opposite interpretation might raise serious constitutional issues. Solicitation of charitable contributions is protected speech. *International Soc'y for Krishna Consciousness v. Lee*, —— U.S. ——, ——, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992); *Riley v. National Federation of Blind*, 487 U.S. 781, 789, 108 S.Ct. 2667, 2673, 101 L.Ed.2d 669 (1988); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 833, 63 L.Ed.2d 73 (1980). Consequently, restrictions on solicitation in traditional public forums must be narrowly drawn to serve a compelling government interest. It is not immediately apparent that exclusion of solicitation of the sort engaged in by the Committee would serve any compelling interest. Given the serious constitutional issues raised by the ordinance, we decline to require San Diego to apply it to the Committee's fund-raising efforts in the absence of evidence that it is similarly enforced against other groups.

ii

■ Kreisner also contends that the City's failure to charge the Committee a permit fee constitutes an impermissible public subsidy and endorsement of religion. We disagree.

The City's written park regulations require non-profit organizations to pay $440 per day for exclusive use of the Organ Pavilion, provided members of the public are not charged admission. If the organization does charge admission, the City's fee doubles to $885 per day. Profit-oriented, commercial users must pay $1,325 per day.

The City's regulations contemplate waiver of these fees only in the case of a "nonprofit community service agency or organization." San Diego Park & Recreation Dep't Fee Policy and Fee Schedule, § 8.2.4 (Sept. 16, 1986). The regulations define such an organization as "[a] recognized group, club, agency, or organization whose activities are of a *service or character building nature*, who give service *to the community as a whole*, and a group where no portion of the net earnings are used for or inure to the benefit of any individual or member of the group." *Id.* (emphasis added). We doubt that the Committee qualifies for a waiver under the regulations, but we need not decide the issue because the City does not rely upon the waiver rules.

The City instead contends that its fee regulations do not apply to the Committee's use of the Pavilion because that use is, in the City's words, "non-exclusive." The City claims that it assesses fees only for "exclusive" permits, which entitle the holder to restrict public access to the area for the duration of the permit. The Committee's display does not occupy the stage, nor does it prevent others from gathering in the amphitheatre. The record reveals that other groups have used the Pavilion while the display is in place. While certain other groups might be reluctant to share the Pavilion with the Committee's indisputably religious display, the Committee in no way seeks exclusive physical control of the Pavilion during its display. Furthermore, the City represents that, should another party seeking an exclusive use permit so request, the Commit-

tee would be asked to cover its display temporarily.

Kreisner cites to no evidence that fees are ordinarily charged to non-exclusive users, nor does he provide any basis for challenging the City's categorization of the Committee's use as non-exclusive. Accordingly, we conclude that the City's grant of a non-fee permit to the Committee is consistent with a content-neutral policy and does not violate the Establishment Clause.[10]

### 3

The third and final prong of the *Lemon* test requires invalidation of a government practice if it fosters an excessive government entanglement with religion. *Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111. "In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Id.* at 615, 91 S.Ct. at 2112.

There is no appreciable institutional entanglement in this case.[11] The City of San Diego provides two forms of aid to the Committee. It grants the Committee's annual request for use of the Organ Pavilion, and to the extent that the display might consume more than $150 worth of electricity, it subsidizes the excess. Both forms of aid are indirect and de minimis; neither demonstrates that the City has an active, deeply involved relationship with the Committee. *See Lynch*, 465 U.S. at 671, 684, 104 S.Ct. at 1358, 1365 (twenty-dollar cost incurred by the city in erecting and dismantling creche

and nominal expenses for lighting did not constitute excessive support for religious activity). The City does not supervise or provide input on the content or design of the display. In fact, the danger of entanglement would be considerably greater if the City screened the religious motives of speakers before allowing them access to Balboa Park. *Widmar*, 454 U.S. at 272 n. 11, 102 S.Ct. at 275 n. 11.

The City's past involvement in the display was more troublesome under the entanglement prong, but that involvement has been discontinued. Assuming that the City's past practices (particularly the supervision of the Committee's fund-raising efforts) amounted to excessive entanglement, we do not view them as relevant to the question of whether the display as currently conducted violates the Establishment Clause.

### III

For the foregoing reasons, we hold that the City has not violated the Establishment Clause by allowing the Christmas Committee to erect a religious display in the Organ Pavilion. We therefore need not determine whether avoiding an Establishment Clause violation would justify excluding the Christmas Committee's religious speech from the public forum. The City remains free to impose reasonable time, place, and manner restrictions on speech in Balboa Park, including religious speech, provided those regulations are content-neutral. We will not, however, force the City to impose such restrictions based on the content of the Committee's speech; to do so would violate the Free Speech Clause, turning the public forum doctrine on its head.

---

**10.** We emphasize once again that our holding does not preclude future actions against the City should the City fail to adhere to its content-neutral policy. Should the City seek to charge rental fees to another group requesting a permit to place an unattended display in Balboa Park, that group could challenge the City's action. Furthermore, evidence that fees are assessed against similar users but not against the Committee would tend to show a City preference for or endorsement of the Committee's religious message.

**11.** Kreisner does not allege that political divisiveness engendered by the City's action violates *Lemon*'s entanglement prong. While the Supreme Court has on occasion suggested that political divisiveness is relevant to the entanglement analysis, *see Committee for Public Education v. Nyquist*, 413 U.S. 756, 796, 93 S.Ct. 2955, 2977, 37 L.Ed.2d 948 (1973); *Lemon*, 403 U.S. at 623, 91 S.Ct. at 2116, it has emphasized that divisiveness alone does not render a practice unconstitutional. *See Lynch*, 465 U.S. at 684, 104 S.Ct. at 1365; *id.* at 669, 104 S.Ct. at 1357 (O'Connor, J., concurring).

We emphasize that the City must treat the Committee as it would any other speaker in Balboa Park. On this record, we conclude that Kreisner has not raised a factual issue of preferential treatment.

AFFIRMED.

KOZINSKI, Circuit Judge, concurring:

Joe Religious Speaker comes to the City of San Diego and asks for a permit to put on a display in Balboa Park exalting the power of Zon.

"Sorry," say the City Fathers and Mothers.

"Why not?" he asks. "Isn't Balboa Park sort of a Hyde Park West where anybody is free to say whatever he wants? In fact, didn't I see a Ku Klux Klan poster, a Communist Manifesto display and an Atheists United banner there?"

"Well, yes," they respond. "Anybody can put up anything he wants there—except religious things. We're afraid people will think the City is sponsoring religion."

This is a conversation that should never happen. Religious speech is *speech*, entitled to exactly the same protection from government restriction as any other kind of speech—no more and no less. *See Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) ("[R]eligious worship and discussion ... are forms of speech and association protected by the First Amendment."). The government has many good reasons for restricting racist speech, advocacy of Communism, pornography and various other kinds of speech that some might see as harmful. But the Free Speech Clause stands in the way. *See, e.g., R.A.V. v. City of St. Paul*, ⸺ U.S. ⸺, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Yates v. United States*, 354 U.S. 298, 318–19, 77 S.Ct. 1064, 1077, 1 L.Ed.2d 1356 (1957); *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir.1985), *aff'd without opinion*, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986); *Cohen v. California*, 403 U.S. 15, 91 S.Ct.

1780, 29 L.Ed.2d 284 (1971); *Collin v. Smith*, 578 F.2d 1197 (7th Cir.), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). I can't see how the fear that someone might—mistakenly—think the government is endorsing religious speech is a better justification for censorship than those rejected in these cases and countless others.

The Establishment Clause, as the name suggests, forbids only the establishment of religion, not the mere appearance of doing so. Many government actions are consistent with religiously-inspired values and can appear to some as endorsing religion. *See, e.g., Bowen v. Kendrick*, 487 U.S. 589, 605, 108 S.Ct. 2562, 2572, 101 L.Ed.2d 520 (1988) (challenging on establishment grounds governmental program promoting abstinence); *Phelps v. Reagan*, 812 F.2d 1293, 1294 (10th Cir.1987) (claim that appointment of an ambassador to the Vatican is establishment of religion). Appearances only support an Establishment Clause claim when the government is speaking—when, for instance the government puts up a crèche or a Christmas tree.[1] But no case, including the cases Judge Boochever mentions, *see* dissent at 804 n. 12, holds that appearances are relevant to *private* speech protected by the Free Speech Clause. The very case Judge Boochever relies on—*County of Allegheny v. ACLU*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)—makes this clear: "The Grand Staircase does not appear to be the kind of location in which all were free to place their displays.... In this respect, the crèche here does not raise the kind of 'public forum' issue, *cf. Widmar*, presented by [a] private crèche in [a] public park." *Id.* at 600 n. 50, 109 S.Ct. at 3104 n. 50 (citations omitted).

A distinction between government and private speech is surely necessary—the government has no right to keep a citizen from, for instance, draping himself in the flag or donning an Uncle Sam suit and carrying a placard proclaiming "America is a Christian Nation." It would not matter whether Uncle

1. When the government selectively adopts and promotes a private speaker's message, we treat the speech as the government's: "We turn next to the *county's* crèche display." *County of Allegheny v. ACLU*, 492 U.S. 573, 598, 109 S.Ct. 3086, 3103, 106 L.Ed.2d 472 (1989) (emphasis added). The district court's findings here refute any suggestion that San Diego gave the Christmas Committee's display a preference over anyone else's.

Sam was carrying his message on a public street, in a park or on the sidewalk in front of City Hall. If a permit is required for such an activity, it must be freely offered to the religious speaker on exactly the same terms as any other speaker, even if there is a risk that onlookers will think his speech is endorsed by the government.

The Establishment Clause prevents the government from treating religious speech more favorably than nonreligious speech. But both the Establishment and Free Speech Clauses prevent the government from treating religious speech less favorably. Because the district court found that the City of San Diego treated the Christmas Committee display just like any other type of speech, I join Judge O'Scannlain's excellent opinion affirming the judgment below.

BOOCHEVER, Circuit Judge, dissenting:

San Diego has permitted a six-week, unattended, life-size display of eight scenes from the life of Jesus Christ and seven quotations from the New Testament to stand in the prominent Organ Pavilion of its Balboa Park. The City has waived over $18,000 annually in user fees for the private group sponsoring the display. San Diego has exempted the donation barrels and written requests for donations accompanying the display from its anti-solicitation ordinance. The City, which co-sponsored the display for 35 of the last 39 years, continues to award a permit to the Christmas Committee according to an unwritten, unannounced policy.

Despite the duration, size, history, and content of the display and the exemption of the Christmas Committee from the City's fee and anti-solicitation ordinances, the majority does not believe that a reasonable observer is likely to perceive that the City of San Diego endorses the display's Christian message. In what amounts to one paragraph of a lengthy opinion, the majority concludes that the Christmas Committee display does not have the primary effect of endorsing religion because Balboa Park is a traditional public forum removed from the seat of government.

Dismissing the possibility of an Establishment Clause violation in this cursory manner erroneously implies that the Free Speech Clause trumps the Establishment Clause. Moreover, San Diego's unwritten, unannounced policy for awarding park permits is itself a violation of the Free Speech Clause because it gives government officials unbridled discretion over speech. Finally, viewing the evidence in the light most favorable to Kreisner, as we must on an appeal from summary judgment for the City, San Diego has in fact preferred the Christmas Committee display over another, first-in-time park permit application in violation of both the Establishment and Free Speech Clauses. Accordingly, I dissent.

## I. Standard of Review for Summary Judgment.

The parties in this case submitted cross motions for summary judgment. We review the district court's decision to grant the City's motion for summary judgment *de novo*. *High–Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 570 (9th Cir.1990). We also review *de novo* the decision to deny Kreisner's motion for summary judgment. *Mukherjee v. INS.*, 793 F.2d 1006, 1008 (9th Cir.1986). Our task is to "determine, *viewing the evidence in the light most favorable to the opposing party*, if there is any genuine issue of material fact and whether the law was correctly applied." *Palmer v. United States*, 794 F.2d 534, 536 (9th Cir.1986) (emphasis added).

Several facts surrounding San Diego's park permit application process remain disputed. As detailed in Section II.B, *infra*, at issue is whether the City has a first-come, first-served policy for issuing park permits, what information the City requires before it issues a permit, and whether the City in fact preferred the Christmas Committee's permit application over another, first-in-time application. The district court on remand arrived at conclusions to disputed questions after hearing contradictory testimony,[1] but the

1. Based upon the testimony of Penny Scott, the District Manager of San Diego's Park and Recreation Department, and Jack Krasovich, the Deputy Director of the Central Division for the City of San Diego, the district court concluded that the City granted park permits on a first-come, first-

majority now accepts those conclusions using the clearly erroneous standard of review. The majority's decision to remand the case to the district court[2] does not alter its obligation to view the disputed facts in favor of Kreisner when reviewing the grant of the City's summary judgment motion. We have not had a full trial on the merits.

The majority justifies its departure from the long-standing rule of considering only undisputed facts in a review of summary judgment by declaring this an extraordinary case. The majority contends that because it remanded the case for an evidentiary hearing on particular issues, we must apply the clearly erroneous standard to the factual findings made in the evidentiary hearing. This argument misapprehends the nature and purpose of the remand order.

The majority's remand order instructed the district court to make factual findings on San Diego's policies for issuing permits for the use of Balboa Park and on any other developments which the parties regarded as "material to the issues in this appeal." We amended the order to allow the district court to "amend its conclusions of law in light of any new factual findings."[3] The issue on this appeal, of course, is whether granting summary judgment to the City and denying summary judgment to Kreisner was proper. Had the majority chosen to remand the case for trial on the issue of whether San Diego had a first-come, first-served permit policy, it could have affirmed a partial summary judgment for the City on all but this issue. A full trial would have ensued on the issue of the City's permit policy, and an appeal from the district court's findings on the underlying disputed factual issues would then be reviewed for clear error as we would no longer have before us a case of summary judgment. We did not, however, follow this course. Instead, we chose to preserve the summary judgment question on this appeal. In opposing the City's motion for summary judgment, therefore, Kreisner's obligation on remand

served basis. This testimony, however, contradicted that of Janet Bergo and Betty Wheeler of the ACLU. The alleged policy was not documented or advertised. The district court's conclusion, therefore, was expressly based upon its assessment of witness credibility. District Court's Findings of Fact and Conclusions of Law 12/13/91 ("Findings") at 4–5, 9 (stating that district court found certain witnesses to be "credible" and reached its "Findings of Fact" after "considering all of the evidence and observing the demeanor of the witnesses"). Determinations of credibility are inappropriate for summary judgment. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir.1992).

The district court also concluded from disputed evidence that the City "reasonably requires specific information regarding the display, such as size and dimension before issuing a permit." Findings at 5. The court reached this conclusion despite the absence of any requirement for such information in the City's permit applications or its Park and Recreation Rules and Regulations. Once again, therefore, the district court based its conclusion on the credibility of the City's witnesses.

2. The majority's decision to remand the case to the district court for further factual findings itself suggests that the district court's granting summary judgment in favor of the City was inappropriate. A genuine issue of material fact must have existed to warrant an additional factual inquiry.

3. We remanded this case to address the City's assertion, raised for the first time at oral argument before this court, that it had a first-come, first-served policy for issuing park permits. The full text of the amended order remanding the case to the district court is as follows:

Submission is VACATED until further order of the court.

This appeal is REMANDED to the district court for sixty days from the date of this order for the limited purpose of making further factual findings. Specifically, the district court shall determine what are the policies of the City of San Diego with respect to granting permits for the use of Balboa Park. The court shall attach to its findings copies of any documents setting forth such policies. If it is contended that there are oral or partially oral policies, the court shall specify any evidence indicating the establishment of such policies and any evidence indicating that the public has been made aware of such policies. The court may make any further findings on factual developments which the parties regard as material to the issues in this appeal. The district court also may amend its conclusions of law in light of any new factual findings.

Upon receipt of the order making further factual findings and (if applicable) amending the conclusions of law, the clerk shall immediately deliver copies of such order to this panel.

Judge Boochever dissents from the order of remand and would decide the case on the present record before the panel.

SUBMISSION VACATED and TEMPORARILY REMANDED.

was to establish that a genuine dispute existed over San Diego's permit policies. The district court on remand reiterated the conclusion of the original district court that the City was entitled to summary judgment.

We are therefore faced with reviewing the factual findings underlying a second district court's order of summary judgment. "[The] limited purpose [of findings of fact in a district court's order of summary judgment] is to pinpoint the *undisputed* facts supporting the summary judgment, not to weigh the evidence in the record." *Swarner v. United States*, 937 F.2d 1478, 1481 (9th Cir.1991) (emphasis added). *Carter v. McCarthy*, 806 F.2d 1373, 1375 (9th Cir.1986), which the majority cites in support of its position, is simply inapplicable. *Carter* states the rule that we review a magistrate's findings of fact underlying the denial of a petition for writ of habeas corpus and a district court's adoption of such findings for clear error. *Id.* at 1375. *Carter* was not a case of summary judgment. Indeed, no Ninth Circuit case has applied a clearly erroneous standard of review to a district court's factual findings, on remand or otherwise, underlying an order of summary judgment. Accordingly, until the factual disputes in this case are resolved at trial, we must view them in the light most favorable to Kreisner for purposes of reviewing the grant of the City's summary judgment motion.

## II. *The Establishment Clause.*

*County of Allegheny v. ACLU*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ("*Allegheny County*"), instructs us to apply the three-part test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to determine whether a private religious display on public property violates the Establishment Clause. "Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion." *Id.* 492 U.S. at 592, 109 S.Ct. at 3100. The majority's conclusion that San Diego's permitting the Christmas Committee display was not "moti-

vated wholly by an impermissible purpose," *Bowen v. Kendrick*, 487 U.S. 589, 602, 108 S.Ct. 2562, 2570, 101 L.Ed.2d 520 (1988), is arguable. It is also arguable that this case does not reflect the type of "enduring entanglement" present in *Lemon*, 403 U.S. at 615–22, 91 S.Ct. at 2112–16. I disagree entirely with the majority, however, insofar as they fail to find at least a triable issue under the primary effect prong of the *Lemon* test.

### A. *Kreisner's Motion for Summary Judgment.*

#### 1. *Undisputed Facts.*

In reviewing the district court's denial of Kreisner's motion for summary judgment, we examine the facts in the light most favorable to the City. No genuine issue of material fact is presented regarding the duration, size, or content of the Christmas Committee's display or its prominent location in the City-owned Organ Pavilion. Also undisputed is San Diego's historical co-sponsorship of the display, the fact that the display is unattended, and the exemption of the display from the City's fee and anti-solicitation ordinances. We may consider these undisputed facts in determining whether the primary effect of the City's granting a permit for the Christmas Committee display advances religion.

#### 2. *Religious Displays Under the Establishment Clause.*

"[W]hen evaluating the effect of government conduct under the Establishment Clause, we must ascertain whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.'" *Allegheny County*, 492 U.S. at 597, 109 S.Ct. at 3103 (opinion of Blackmun, J.) (quoting *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)). The scope of our inquiry encompasses not only the government's current practice, but also the " 'history and ubiquity' " of that practice. *Id.* at 492 U.S. at 630, 109 S.Ct. at 3120 (O'Connor, J., concurring) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 693, 104 S.Ct. 1355, 1369, 79

L.Ed.2d 604 (1984) (O'Connor, J., concurring)). The analysis admittedly is fact-intensive since " '[e]very government practice must be judged in its unique circumstances.' " *Id.* 492 U.S. at 595, 109 S.Ct. at 1232 (quoting *Lynch,* 465 U.S. at 694, 104 S.Ct. at 1370 (O'Connor, J., concurring)).

Beyond these broad proclamations, the jurisprudence surrounding the constitutionality of private religious displays on public property is splintered. In this evolving area of the law, we continue to grope for a sensible and practical framework with which to analyze the myriad factual permutations that confront us. After examining the various decisions regarding the constitutionality of religious displays, I conclude that the analysis can be organized around two principal questions. Although the cases do not specifically so hold, I believe that whether a religious display on public property has the primary effect of advancing religion in violation of the *Lemon* test is a function of the interplay between (1) the intensity of the religious message and (2) the nature of the government's association with that message. Essentially, this interplay involves a sliding scale: the more intense the religious message, the less associated the government needs to be with that message to violate the Establishment Clause. Conversely, the less intense the religious message, the closer the government may be associated without crossing the divide between church and state. Approaching the caselaw using this analytical framework helps to tame the factors that courts have found significant in determining the constitutionality of religious displays.[4]

a. *Intensity of the Religious Message.*

The intensity of the religious message is a function of (1) the religious potency of the display itself; (2) whether secular symbols accompany the display; (3) whether the display is sectarian or plural; and (4) the size and duration of the display. Regarding the religious potency of the display itself, a creche depicting the Christian nativity scene,

for instance, would be considered more potent than the display of a Christmas tree. *Compare Lynch,* 465 U.S. at 711, 104 S.Ct. at 1379 (Brennan, J., dissenting) ("[A] nativity scene represents far more than a mere 'traditional' symbol of Christmas. The essence of the creche's symbolic purpose and effect is to prompt the observer to experience a sense of simple awe and wonder appropriate to the contemplation of one of the central elements of Christian dogma—that God sent His Son into the world to be a Messiah.") *with Allegheny County,* 492 U.S. at 616–17, 109 S.Ct. at 3113 ("The Christmas tree, unlike the menorah, is not itself a religious symbol. . . . Numerous Americans place Christmas trees in their homes without subscribing to Christian religious beliefs. . . ."). Thus, the more religiously potent the display, the more intense is the religious message conveyed.

A display unaccompanied by secular symbols also conveys a more intense religious message than does a religious display which is part of a larger secular presentation. In *Lynch,* for instance, the creche was surrounded by, "among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cut-out figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, [and] a large banner that reads 'SEASONS GREETINGS.' " 465 U.S. at 671, 104 S.Ct. at 1358. Justice O'Connor's concurrence concluded that the secular setting " 'change[d] what viewers may fairly understand to be the purpose of the display' and 'negate[d] any message of endorsement' of 'the Christian beliefs represented by the creche.' " *Allegheny County,* 492 U.S. at 596, 109 S.Ct. at 3102 (quoting *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring)). *Compare Kaplan v. City of Burlington,* 891 F.2d 1024, 1029 (2nd Cir.1989) (menorah "was displayed alone so that there was nothing to indicate that the thrust of its message was secular rather than religious"), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990).

---

4. Although the majority characterizes this approach as a new Establishment Clause test, I emphasize that I do not intend to replace the *Lemon* test but merely to refine the "effects" prong of *Lemon* in the limited context of judging the constitutionality of religious displays on government property. I believe my characterization of this approach finds support in the Establishment Clause jurisprudence as is evident in my citations throughout this discussion.

Furthermore, a display that represents the beliefs of a particular religious denomination conveys a more intense religious message than a display that "convey[s] a message of pluralism and freedom of belief during the holiday season." *Allegheny County*, 492 U.S. at 635–36, 109 S.Ct. at 3123 (O'Connor, J., concurring) (although creche standing alone was unconstitutional, menorah standing next to Christmas tree was constitutional because "[a] reasonable observer would ... appreciate that the combined display is an effort to acknowledge the cultural diversity of our country and to convey tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in diverse ways by our citizens").

Finally, a religious display that is large and long-standing more intensely communicates a religious message than a smaller, more temporary display. "[A] private religious group may so dominate a public forum that a formal policy of equal access degenerates into endorsement.... [S]urely the City cannot allow a religious group to turn a public park into an enormous outdoor church." *Doe v. Small*, 964 F.2d 611, 625 (7th Cir.1992) (en banc) (Cudahy, J., concurring); *see also Allegheny County*, 492 U.S. at 661, 109 S.Ct. at 3137 (Kennedy, J., concurring and dissenting) ("I doubt not ... that the [Establishment] Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall.... [S]uch an obtrusive year-round religious display would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion."). Considering a display in light of these factors conveys a sense of the intensity of the religious message conveyed.

b. *Nature of Government's Association with the Religious Message.*

The second principal inquiry, the nature of the government's association with the religious message, depends upon (1) the ownership of the display; (2) the ownership of the display's location; (3) the historical sponsorship of the display; (4) the extent to which the display is surrounded by government symbols; and (5) whether the display is unattended. Clearly, where the government owns the display itself, the government is closely associated with the content of the display. Where the display is privately owned but the government owns the property on which the display stands, the government still associates with the display's message, although to a somewhat lesser degree. *See Allegheny County*, 492 U.S. at 600, 109 S.Ct. at 3104; *Kaplan*, 891 F.2d at 1028. This association, however, is strengthened when the government sponsored the display for many years. *See Allegheny County*, 492 U.S. at 630, 109 S.Ct. at 3120 (O'Connor, J., concurring).

The government's association with a private religious display becomes more pronounced when the display's location is not only government-owned, but also symbolic of government itself. Thus, a religious display on the grand staircase of the county courthouse, *Allegheny County*, 492 U.S. at 579–80, 109 S.Ct. at 3093, or within sight of city hall, *Kaplan*, 891 F.2d at 1029, or in front of a county building, *Smith v. County of Albemarle*, 895 F.2d 953, 954 (4th Cir.), *cert. denied*, 498 U.S. 823, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990), symbolically is more closely associated with the government than a display located on unadorned government land.

Finally, where the private religious display is unattended, the government is more closely associated with the content of the display than if the display were attended. The reasonable observer of a religious display might naturally question whether the government subscribes to the religious message. When a private party actively and personally participates in a display, the passerby can readily attribute the religious message to a private citizen and thereby disassociate the government. Thus, the evangelist who preaches in a public park is less likely to be associated with the government than would an unattended display conveying the same sermon. Although a sign disclosing the owner of the religious display may help diffuse the misconception of government sponsorship, such a sign, by itself, will not negate the perception of government support for the unattended

display. *See Allegheny County*, 492 U.S. at 600–01, 109 S.Ct. at 3105; *Smith*, 895 F.2d at 958 ("It remains to be seen whether *any* disclaimer can eliminate the patent aura of government endorsement of religion.").

### c. The Sliding Scale between Religious Intensity and Government Association.

Once we assess the intensity of the religious message and the nature of the government's association with that message, the inquiry turns to the interplay between these two factors. I believe the caselaw may be construed to support the characterization of this interplay as a sliding scale.

In *Allegheny County*, for example, the Court drew a line between the creche depicting the Christian nativity scene, which was held unconstitutional, and the menorah/Christmas tree display, which was held constitutional. In both instances, the government association with the display remained relatively constant: both displays were privately-owned, unattended, and located at the county courthouse, a structure symbolizing government. 492 U.S. at 578–79, 109 S.Ct. at 3093. The constitutional difference between the displays lay in the intensity of their religious messages. The creche was a potently religious display with a distinctly denominational, Christian message. Its manger had at its crest an angel bearing a banner proclaiming "Gloria in Excelsis Deo!," meaning "Glory to God in the Highest." *Id.* at 580 & n. 10, 109 S.Ct. at 3095 & n. 10. No secular symbols accompanied the creche. *Id.* at 580, 109 S.Ct. at 3093. The display stood for over six weeks, from late November to early January. *Id.* The menorah, on the other hand, was erected next to a Christmas tree. Although the menorah was a potently religious symbol of the Jewish faith, the combined display was expressly non-denominational. *Id.* at 635, 109 S.Ct. at 3123 (O'Connor, J., concurring). Furthermore, the City's sign accompanying the display stressed the secular theme of "liberty and pluralism." [5] *Id.* Finally, the menorah stood for just over

three weeks, from late December to mid-January. *Id.* at 587, 109 S.Ct. at 3097. Clearly, given the holding of the case, the government's association with the message of the menorah/Christmas tree display was tolerable, but the government was too closely associated with the more intense religious message of the creche.

Similarly, other cases suggest that where the intensity of the religious message is constant, the constitutionality of a private religious display will turn on the nature of the government's association with the display. In *Chabad–Lubavitch of Georgia v. Miller*, 976 F.2d 1386 (11th Cir.1992), the Eleventh Circuit held that permitting a private group to erect a menorah in the rotunda of the state capitol would violate the Establishment Clause. The Sixth Circuit, on the other hand, denied a motion to enjoin a private religious group from erecting a menorah in a public square in Cincinnati because it determined that such a display would be constitutional. *Congregation of Lubavitch v. City of Cincinnati*, 923 F.2d 458 (6th Cir.1991). The court distinguished the case from those situations in which the location of the display is close to symbols of government, holding that the Cincinnati square had "no connection with any government buildings or function." *Id.* at 459–60. Thus, where religious displays of identical intensity are involved, the Establishment Clause may be violated where the government has a relatively close association with the display, and not violated where the association is more remote. Taken together with *Allegheny County*, I believe these cases, while not articulating such an approach, support my characterization of the interplay between the intensity of the religious message and the nature of the government's association with that message as a sliding scale.

The majority advances three arguments against the sliding scale test. First, the majority asserts that inquiring into the intensity of a religious message is similar to evaluating the centrality of a particular belief or practice to a faith, which is prohibited in analyzing a case under the Free Exercise

---

**5.** The sign read: "During this holiday season, the City of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of

the flame of liberty and our legacy of freedom." *Id.*

Clause. Second is the concern over whose perspective we use to determine intensity. Third, the majority contends that the consequence of the sliding scale analysis would be to dilute the religious messages allowed in public forums. These concerns are overstated.

Evaluating to what degree a message is religious differs from determining whether a belief or practice is central to a faith. The former inquiry merely asks what is being communicated, a question that courts face daily in such contexts as defamation and contract. Indeed, if we were prohibited from asking whether a message is religious, then we could never ask whether the government endorsed a religious message. In such a world, we would have no Establishment Clause.

Moreover, the Supreme Court has recognized that the intensity of a religious message is a necessary inquiry under the Establishment Clause. *See* discussion of *Allegheny County, supra.* It is the variation in the intensity of the religious message that explains why a Christmas tree display was permitted in this very courthouse during the month of December when a creche in the same location would have been impermissible. *See Allegheny County,* 492 U.S. at 579–80, 109 S.Ct. at 3093 (creche displayed on grand staircase of county courthouse violated the Establishment Clause).

Regarding the question of perspective in judging the intensity of a religious display, I would not depart from the "reasonable observer" standard that we use in current Establishment Clause jurisprudence, and many other contexts for that matter. As the Court stated in *Allegheny County,* we must examine a display from the perspective of both adherents and nonadherents of the control-

ling denominations. *Id.* at 597, 109 S.Ct. at 3103 (opinion of Blackmun, J.). Although the majority criticizes the sliding scale approach because it allegedly lacks "manageable standards to apply in making these sensitive judgments," Opinion at 781, I note that the same problem, if a problem at all, inheres in the current jurisprudence when evaluating whether government endorses a religious belief. From the perspective of the reasonable observer, courts have determined that a Santa Claus display is non-religious, but a menorah display is religious. *Compare Lynch,* 465 U.S. at 671, 104 S.Ct. at 1358 (Santa Claus display considered part of secular presentation) *with Kaplan,* 891 F.2d at 1029 (thrust of menorah display was religious message). Apparently, we have managed to overcome the difficulties associated with the question of perspective.

Finally, the majority's conclusion that the sliding scale test would result in only diluted religious messages being allowed in public forums is oversimplified. Only intensely religious displays that are closely associated with the indicia of government are disallowed. In fact, one could rephrase the majority's concern as follows: the sliding scale test would allow government to appear to endorse only diluted or non-religious messages, but not intensely religious messages. I believe this is precisely the result the Establishment Clause was intended to achieve.

### 3. *The Christmas Committee Display.*

Applying these principles to the present case, I conclude that the Christmas Committee display is unconstitutional and that Kreisner is entitled to summary judgment under the Establishment Clause. The religious intensity of the display's message is unprecedented.[6] First, the display itself is potently

---

**6.** Photographs of the Organ Pavilion and two booths representative of the display are included in the Appendix to this dissent.

I have found only one case, *Doe v. Small,* 964 F.2d 611 (7th Cir.1992) (en banc), involving a display which can even remotely approximate the religious intensity of the display in this case. *Doe* involved the exhibition of a series of religious paintings in a public park. Unlike the case at issue here, however, *Doe* did not involve lifesize sculptures or a prominent display of passages from Christian scripture. In addition, the

public park in which the display in *Doe* was located was unadorned with government-owned buildings or structures. *Id.* at 613.

*Doe* is also distinguishable because the court never addressed whether the religious display at issue violated the Establishment Clause. *Id.* at 617, 622 (parties did not appeal Establishment Clause issue). Indeed, the *Doe* court was "not in agreement as to whether the City violated the Establishment Clause in its conduct." *Id.* at 617. Hence, to the extent that the religious paintings in *Doe* are similar to the religious display in this

religious and sectarian. The display's eight booths are drawn from the New Testament's account of the life of Christ. The first scene depicts "The Annunciation," the sacred moment in Christian theology when, in the Gospel according to Luke, the Angel Gabriel informs the Virgin Mary that she will be the mother of God on earth. In the second scene, the expectant Mary and Joseph are being turned away at the Inn in a scriptural moment that represents mankind's hostile reception of Christ. The third scene portrays the humble shepherds' immediate acceptance of the divinity of Christ. The fourth scene depicts the actual birth of Christ, which, when taken in the context of the parable, is a patently religious, rather than historical, moment. The fifth scene, portraying the three wise men in their journey to Bethlehem, "reflects the early [Christian] church's experience of the Gentiles' readiness to accept the gospel and the disappointing slowness of all Israel to receive it." Daniel J. Harrington, *Collegeville Bible Commentary: The Gospel According to Matthew* 17 (1983). The sixth scene depicts Mary, Joseph, and the newborn Christ fleeing from Herod, implicitly denoting "Jesus as the new Moses." Hans Kung, *On Being a Christian* 451 (Edward Quinn trans., 1976) (emphasis omitted). The seventh scene shows "Christ in the Temple," the moment when the religious mission of Jesus was first announced. *See Harper's Bible Dictionary* 1029 (Paul J. Achtemeier ed., 1985). The eighth and final scene portrays Christ as an adult teacher, with young children drawing near to hear Christ's lesson.

Not only does the display contain potent religious imagery, it also presents a series of passages from the New Testament. Thus the religious message becomes quite literal. Indeed, the seven scriptural quotations magnify the significance the Court attached to the single Latin phrase in *Allegheny County.* There, the Court explained that "[t]his praise to God in Christian terms is indisputably religious—indeed sectarian—just as it is when said in the Gospel or in a church ser-

vice." *Allegheny County,* 492 U.S. at 598, 109 S.Ct. at 3103.

Second, no secular symbols accompany the Christmas Committee display. The nearest secular symbols of the season reside in another area of the park separated by a wall, landscaping, and a road. The eight religious booths are indisputably their own display so that "[t]he presence of Santas or other Christmas decorations elsewhere ... fail[s] to negate the endorsement effect" of the display. *Id.* at 598–99 n. 48, 109 S.Ct. at 3104 n. 48. In fact, the Christmas Committee itself declares that the display is motivated by its "desire to present a non-commercial celebration of the true 'Spirit of Christmas.'"

Third, the display contains no symbols of other, non-Christian religions. Finally, the display is large and enduring. Each of the eight booths contains life-size figures, with the display occupying both sides of the stage in the Organ Pavilion. The City permits the display to remain there for six weeks.

In summary, no court has been presented with a display of such blatant, denominational, and conspicuous religious intensity—a display which the majority characterizes as conveying an "overwhelming message of glorification of the divinity of Jesus Christ." Opinion at 782.

Considering the intensity of the religious message, virtually any government association with the Christmas Committee display would break with the principles announced in the Establishment Clause. Admittedly, the symbols of the government's association with the display may not be as pervasive as in *Allegheny County* or other cases in which the displays were located in the "seat of government." Nevertheless, the undisputed facts in this case reveal that San Diego's association with the display is more than incidental.

The ownership of the display is private, but the property on which the display rests is owned and maintained by San Diego's taxpayers. The City has an historical involvement with the display. Prior to 1988, City employees erected, removed, and stored the

case, the result in *Doe* cannot be considered even as persuasive authority on the Establishment Clause question.

display each year. Moreover, the property is adorned with structural symbols of government. Surrounding the Organ Pavilion in Balboa Park are the United Nations Building, the Hall of Nations, the House of Pacific Relations, the Museum of Man, the San Diego Museum of Art, the Space Theater and Science Center, and the Natural History Museum. The Organ Pavilion itself is a massive, ornate, semi-enclosed structure. The pavilion's columns, arches, and elevated stage provide the backdrop for the display. This is not merely a religious exhibit isolated from indicia of city sponsorship. With eight large booths flanking both sides of the Organ Pavilion's center stage, the display appears to be an integral part of the City-owned structure. No reasonable observer could visit the Christmas Committee display without sensing the government's presence. Furthermore, the display is unattended.[7] None of the Christmas Committee's members remains with the display to help diffuse the government's association with the religious message. Accordingly, the reasonable observer could easily take the government's presence to be the government's endorsement of the display. In light of the unprecedented religious intensity of this display, the real and symbolic association between San Diego and the religious message conveyed violates the Establishment Clause.

Any remaining doubts of an Establishment Clause violation are shattered when one considers the City's exemption of the Christmas Committee display from its fee regulations and anti-solicitation ordinance. Ordinarily, the City's park regulations require a nonprofit or charitable organization to pay $440 per day for use of the Organ Pavilion, provided that the organization does not charge admission to members of the public who attend the function. The City waives the fee only for "a nonprofit community service agency or organization." Such an organization is defined as "[a] recognized group, club,

agency, or organization whose activities are of a *service or character building nature,* who give service *to the community as a whole,* and a group where no portion of the net earnings are used for or inure to the benefit of any individual or member of the group" (emphasis added).

The City argues, and the majority asserts, that the regulations require payment of user fees only for "exclusive use" of the Organ Pavilion and that the Christmas Committee display is a "non-exclusive use." Although San Diego has few written regulations governing its park permit application process, it does have a detailed, written policy governing park fees and fee waivers. Nowhere in that policy does the City ever mention exclusivity as a prerequisite for imposing fees or "non-exclusive" use as a criterion for a fee waiver. This is yet another example of the City's ad hoc approach to administering park permits, discussed in Section II.B, *infra.* I cannot join the majority in reading an exclusivity requirement into the City's user fee regulations or in sanctioning the City's departure from its own written fee policy. Indeed, it is the opinion of the City Attorney's office itself that the City's fee waiver is unconstitutional.

I agree with the City Attorney's office that allowing the Christmas Committee to forego paying more than $18,000 in fees per year violates the Establishment Clause. It is questionable that the Christmas Committee is a "service or character building" organization, other than in the sense that any religious denomination considers itself to further such goals. It is unquestionable that the Christmas Committee's intensely sectarian message does not serve "the community as a whole." Indeed, the record shows that every other religious organization who used the Organ Pavilion between September 1987 and September 1989 paid a user fee.[8] Standing alone, San Diego's conferring this unusual annual economic benefit only upon the

---

7. Although it is contended that the display contains a disclaimer sign attributing its sponsorship to the Christmas Committee, the content of the sign does not appear in the record. As noted earlier, however, such a sign cannot dissolve the perception of government support for the religious message of the display.

8. The only possible exception is a fee waiver given to St. Augustine High School for a concert on May 6, 1989. This fee waiver, however, was consistent with waivers given to the other high schools who held concerts throughout the two-year period.

Christmas Committee constitutes an unconstitutional endorsement of religion. *See Gillette v. United States*, 401 U.S. 437, 450, 91 S.Ct. 828, 836, 28 L.Ed.2d 168 (1971) ("[T]he Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization.... [T]he Establishment Clause stands at least for the proposition that when government activities touch on the religious sphere, they must be secular in purpose, evenhanded in operation, and neutral in primary impact.").

Finally, the City's exempting the Christmas Committee from its anti-solicitation ordinance further manifests an endorsement of religion. A regulation and municipal ordinance both prohibit solicitation in San Diego's public parks. Nevertheless, the City permits the Christmas Committee to place donation barrels and fliers soliciting contributions at the display.

The City maintains that these barrels and fliers do not meet its definition of "solicitation." The relevant ordinance defines "solicitation" to "mean and include ... any direct oral or written request for money, property, or anything of value or any financial assistance of any kind." San Diego's claim is specious given this definition. The flier asks visitors to "Help Us Keep the Community Christmas Center Going!" and explains that "[t]o insure the continuing operation of the Community Christmas Center, voluntary contributions are essential." The flier goes on to request that visitors make their checks payable to the Christmas Committee Center in pre-selected "membership categories" of $10, $25, $50, and $100. It concludes by instructing contributors to put the donations in the barrels or mail them to a given address. I find it difficult to imagine a more "direct ... written request for money."

We should order that summary judgment be granted to Kreisner based upon the undisputed facts. "[T]he Establishment Clause prohibits precisely what occurred here: the government's lending its support to the communication of a religious organization's religious message." *Allegheny County*, 492 U.S. at 601, 109 S.Ct. at 3105.

B. *The City's Motion for Summary Judgment.*

For the same reasons that Kreisner is entitled to summary judgment, we should reverse the summary judgment for San Diego under the Establishment Clause based on the undisputed facts. The disputed facts, however, present additional reasons for reversing the City's summary judgment.

The parties agree on, or do not deny, the following facts pertaining to the City's park permit application practice. At oral argument before this court, counsel for San Diego represented for the first time in this appeal that the City grants park permits for longterm, unattended displays on a first-come, first-served basis. Betty Wheeler, Legal Director of the ACLU in San Diego, attended the oral argument. Wheeler was surprised by the City Attorney's representations. She had worked regularly with attorneys and others whom she thought would be familiar with the City's alleged first-come, first-served policy, yet neither she nor any of the colleagues she contacted were aware of such a policy.

Wheeler decided to test the veracity of the City's representations.[9] The bicentennial celebration of the signing of the Bill of Rights would occur in December 1991, and Wheeler thought that a month-long, unattended display in the Organ Pavilion during December would both commemorate the event and test the City's policy.[10] Wheeler

9. The majority suggests that Kreisner and the ACLU inappropriately "create[d]" issues of material fact after the district court's grant of summary judgment. I disagree. That San Diego had a first-come, first-served policy for issuing park permits for long-term, unattended displays was first asserted by the City at oral argument before this court. Thus, if any party "created" the issue, the City did. Indeed, the majority instructed the district court on remand to "make any further findings *on factual developments*

which the parties regard as material to the issues in this appeal" (emphasis added). Accordingly, the district court appropriately heard testimony regarding the City's purported first-come, first-served policy and the ACLU's experience suggesting that no such policy existed.

10. The majority's statement that "the ACLU had no intention of erecting such a display" conflicts with Ms. Wheeler's sworn statement that she obtained a commitment from her executive di-

instructed Janet Bergo, an administrative assistant for the ACLU, to hand-deliver a letter to the City's Park and Recreation Department and to obtain a permit for the display. The letter requested use of the area in the Organ Pavilion where the Christmas Committee display had traditionally been located. The letter also explained the time frame and content of the display, which would consist of "a series of panels illustrating the rights guaranteed to Americans by the Bill of Rights." It noted that "[t]he panels would not block the view of the stage, or otherwise physically preclude other uses of the Organ Pavilion." Wheeler attempted to draft the letter so that it clearly fell within the permit policy as the City Attorney had described it at oral argument. She even used the term "non-exclusive use permit" which had been used by the City Attorney.

Bergo delivered the letter to and met with Penny Scott, the City's district manager for Balboa Park, on April 4, 1991. Bergo showed Scott a poster illustrating what the panels would look like. Scott was genuinely enthusiastic about the display until she realized that it might conflict with the Christmas Committee display. Scott said that she wanted to know "more details about how [the display] would look" and that she "needed to talk to her boss or the city attorney to work this out." Bergo asked whether the ACLU would be able to have the location requested for the display. Scott responded that the Christmas Committee's display was "always there."

Bergo telephoned Scott later that same day. The parties disagree over the content of this telephone conversation. We must therefore accept Kreisner's account of the conversation in reviewing the grant of the City's summary judgment motion.

According to Kreisner, Bergo clarified during her telephone conversation with Scott that the size of the display would be the same as that of the Christmas Committee display. Scott responded that both the ACLU's requested display and the Christmas Committee display could not possibly be

at the same location simultaneously. Bergo asked whether the requested location had already been reserved. Scott responded, "Oh, yes, the Nativity scenes have come back for 20 to 25 years. It's already booked. They will be there every year until they decide not to do it again." In fact, the Christmas Committee did not request the Organ Pavilion until September 1991, almost five months later. Bergo then asked how soon she would need to contact the City about reserving the location for the next year. Scott again replied that the Christmas Committee was "always there."

The majority accepts the district court's conclusion that the ACLU's permit application ultimately was rendered inactive because it lacked "specifics." The only "specific" that was ever mentioned was the size of the display. However, after Bergo's April 4 telephone conversation with Scott, it appears, accepting Kreisner's account of the conversation, that Scott understood how large the ACLU display would be. When Bergo told Scott that the display would be the same size as the Christmas Committee's display, Scott responded, "Oh, my god, those things are booths; they're over your head; those are really big." Indeed, Scott knew precisely that this meant each display would be 12 feet square. These were virtually the same dimensions that Wheeler provided to Scott in her October 2, 1991, follow-up letter. Oddly, this letter, mailed *after* the City had granted the permit to the Christmas Committee, satisfied Scott's "need" for specifics, but the same information provided *before* the Christmas Committee received its permit would not suffice.

The remaining series of events surrounding the ACLU's permit application are undisputed. Bergo again contacted Scott by telephone in July 1991 to ask whether the ACLU's permit had been granted. Scott responded that she needed some information and had taken no action. Wheeler also wrote to Scott in October 1991 inquiring about the status of the permit application. Scott responded in writing that the ACLU's permit

rector to put on the display if the ACLU were awarded the permit. At minimum, Ms. Wheel-

er's testimony presents a triable issue of fact.

application had been deemed inactive because it lacked the necessary specifics. She also stated that the Christmas Committee had been given the location that the ACLU had previously requested.

Considering these facts in the light most favorable to Kreisner, as we must, it becomes even clearer that the district court's grant of summary judgment to the City was improper. Whether the City in fact had a first-come, first-served policy for long-term, unattended displays, whether the City embellished the policy with ad hoc requests for "specifics," and whether the City favored the Christmas Committee's application over the ACLU's first-in-time application at minimum are triable issues of material fact. If we assume Kreisner's version of the disputed facts, San Diego reserved the Organ Pavilion for the Christmas Committee display despite the ACLU's first-in-time application, and used its request for "specifics" as a subterfuge to render the ACLU's application inactive.

Although there may be room to debate the meaning of the Establishment Clause at its fringes, the core of its protection remains indubitable: the government can "effect no favoritism among [religious] sects or between religion and nonreligion." *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 305, 83 S.Ct. 1560, 1615, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring); *accord Allegheny County*, 492 U.S. at 590, 109 S.Ct. at 3099 ("[T]his Court has come to understand the Establishment Clause to mean that government ... may not discriminate among persons on the basis of their religious beliefs and practices...."); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 27, 28, 109 S.Ct. 890, 906, 906, 103 L.Ed.2d 1 (1989) (Blackmun, J., concurring in judgment) ("government may not favor religious belief over disbelief" or adopt a "preference for the dissemination of religious ideas"); *Edwards v. Aguillard,* 482 U.S. 578, 593, 107 S.Ct. 2573, 2582, 96 L.Ed.2d 510 (1987) ("preference" for particu-

lar religious belief constitutes an endorsement of religion); *Wallace v. Jaffree*, 472 U.S. 38, 70, 105 S.Ct. 2479, 2497, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring) (Establishment Clause "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred"). A finding that the City played favorites in reserving the Organ Pavilion for the Christmas Committee over the ACLU, therefore, would constitute an independent basis for concluding that San Diego has violated the Establishment Clause.

### III. *The Free Speech Clause.*

Besides forbidding the government from making laws respecting the establishment of religion, the First Amendment also prohibits the government from making laws "abridging the freedom of speech." U.S. Const. amend. I. Two doctrines that emerge from this clause are relevant to the case at hand. First, the public forum doctrine allows content-based regulation of speech in a public forum only where the "regulation is necessary to serve a compelling state interest and ... is narrowly drawn to achieve that end." *Widmar v. Vincent*, 454 U.S. 263, ·270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981). The majority holds that this doctrine permits, and possibly requires, San Diego to allow the Christmas Committee display. Preventing San Diego from violating the Establishment Clause, however, is a compelling state interest, and an injunction in this case is necessary to achieve that end. Second, the prior restraint doctrine prohibits giving government officials unbridled discretion in licensing speech. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988). I believe that the City's informal policy of awarding park permits gives park officials unbridled discretion to discriminate against speech in violation of the Constitution.[11]

---

11. Although the factual issues underlying the prior restraint doctrine were addressed by the district court on remand and argued by the parties in the supplemental briefing to this court, Kreisner, who appeared *pro se* in the original proceedings, did not state his case in terms of the prior

restraint doctrine until he, when represented by counsel, filed his supplemental reply brief.

Whether the City had unbridled discretion to issue park use permits is integral to analyzing whether the City in fact favored the Christmas Committee display over that of the ACLU in

## A.  *The Public Forum Doctrine.*

For purposes of analyzing whether the Free Speech Clause is violated, the Supreme Court uses the categories of traditional public, designated public, and non-public forum to determine whether government may prohibit speech in a particular location.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).  A traditional public forum is a place, such as a public street or park, which has " 'immemorially been held in trust for the use of the public and, time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Id.* (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)).  Designated public forums are public properties "which the State has opened for use by the public as a place for expressive activity." *Id.*  A non-public forum is "[p]ublic property which is not by tradition or designation a forum for public communication."  *Id.* 460 U.S. at 46, 103 S.Ct. at 955.  In both the traditional and designated public forums, a regulation excluding speech based on content must be narrowly drawn to achieve a compelling state interest.  *Id.* at 45, 46, 103 S.Ct. at 955, 956.

There is no question that the Christmas Committee display would be unconstitutional if it stood within a county courthouse or in front of City Hall.  In both cases, the display would violate the Establishment Clause.  *See*

violation of the Establishment Clause.  Furthermore, the unbridled discretion inquiry coincides with whether the City provides equal access to speech under the Free Speech Clause.  Therefore, whether the City exercised unbridled discretion over speech was implicitly at issue before the district court.  Kreisner contended that the City had no articulated standards for issuing permits, and the parties had "an opportunity to dispute the facts material to that claim." *Fountain v. Filson,* 336 U.S. 681, 683, 69 S.Ct. 754, 755, 93 L.Ed. 971 (1949).  Moreover, the issue is inextricably intertwined with the City's and the majority's free speech justification.

To the extent that the prior restraint doctrine is considered an issue not presented to the district court, we have held that "[e]xceptional cases or particular circumstances may prompt a reviewing court, *where injustice might otherwise result or where public policy requires,* to consider questions neither pressed nor passed upon below."

*Allegheny County,* 492 U.S. at 579, 109 S.Ct. at 3093; *Kaplan,* 891 F.2d at 1029.  Although the majority avoids reaching the issue, preventing such a violation is a compelling state interest which justifies a content-based regulation forbidding such a display, thereby satisfying the standard announced in *Perry.  Widmar,* 454 U.S. at 271, 102 S.Ct. at 275 (state University's interest "in complying with its constitutional obligations may be characterized as compelling").  The question is whether placing the same display in the Organ Pavilion of San Diego's Balboa Park alters the legal outcome.

In holding that "because the [Christmas Committee] display is private speech in a traditional public forum removed from the seat of government it does not have the primary effect of advancing religion," Opinion at 782, the majority frames its Establishment Clause discussion in terms of public forum doctrine and thereby suggests that the resolution of an Establishment Clause challenge is dependent on the resolution of the public forum issue—in other words, that the Free Speech Clause trumps the Establishment Clause.  The concurrence brings this point into sharp relief.  According to the concurrence, "[r]eligious speech is *speech,* . . . no more and no less."  Judge Kozinski, concurring, at 790.  This statement ignores the Establishment Clause.  As Justice Kennedy wrote for the majority in *Lee v. Weisman,* —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992):

*Nuelsen v. Sorensen,* 293 F.2d 454, 462 (9th Cir. 1961) (emphasis added).  Justice and public policy require that we determine whether San Diego's permit application process is an unbridled prior restraint of speech:

The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours.  It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect policy and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests.

*Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971).

The First Amendment protects speech and religion by quite different mechanisms. Speech is protected by insuring its full expression even when the government participates, for the very object of some of our most important speech is to persuade the government to adopt an idea as its own.... In religious debate or expression the government is not a prime participant, for the Framers deemed religious establishment antithetical to the freedom of all.... [T]he Establishment Clause is a *specific prohibition* on forms of state intervention in religious affairs *with no precise counterpart in the speech provisions.* The explanation lies in the lesson of history that was and is the inspiration for the Establishment Clause, the lesson that in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce. A state-created orthodoxy puts at grave risk that freedom of belief and con-

science which are the sole assurance that religious faith is real, not imposed.

*Id.* at — – —, 112 S.Ct. at 2657–58 (citations omitted) (emphasis added). Accordingly, although "[t]he government has many good reasons for restricting racist speech, advocacy of Communism, pornography and various other kinds of speech that some might see as harmful," Judge Kozinski, concurring, at 790, the government does not have the reason that the Constitution expressly forbids the government from appearing to endorse those kinds of speech. The Constitution does, however, forbid the government from appearing to endorse religious speech.[12] The principle, therefore, is clear: a violation of the Establishment Clause can never be saved by the Free Speech Clause. Otherwise, the Establishment Clause would be emasculated.

I agree with the majority that the Organ Pavilion is a traditional public forum. The

---

**12.** The concurrence challenges this sentence, arguing that the Establishment Clause "forbids only the establishment of religion, not the mere appearance of doing so." Judge Kozinski, concurring, at 790. The Supreme Court clearly supports my reading of the content of the Establishment Clause. *Allegheny County*, 492 U.S. at 574, 109 S.Ct. at 3090 ("The [Establishment] Clause, at the very least, prohibits government from *appearing* to take a position on questions of religious belief....") (emphasis added); *id.* at 595, 109 S.Ct. at 3102 ("[T]he question is 'what *viewers may fairly understand* to be the purpose of the display.'") (quoting *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring)) (emphasis added); *id.* 492 U.S. at 597, 109 S.Ct. at 3103 ("[W]e must ascertain whether 'the challenged governmental action is sufficiently likely to be *perceived* by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.'") (quoting *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)) (emphasis added); *Westside Community Bd. of Educ. v. Mergens,* 496 U.S. 226, 264, 110 S.Ct. 2356, 2379, 110 L.Ed.2d 191 (1990) (Marshall, J., concurring) ("If public schools are *perceived* as conferring the imprimatur of the State on religious doctrine or practice as a result of such a policy, the nominally 'neutral' character of the policy will not save it from running afoul of the Establishment Clause.") (emphasis added); *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring) ("It is only practices having [the effect of communicating endorsement or disapproval of religion], whether intentionally or unintentionally, that make religion relevant, in reality

or public perception, to status in the political community.") (emphasis added); *id.* at 711, 104 S.Ct. at 1379 (Brennan, J., dissenting) ("But when [government] officials participate in or *appear* to endorse the distinctively religious elements of this otherwise secular event [Christmas], they encroach upon First Amendment freedoms.") (emphasis added); *Widmar,* 454 U.S. at 280–81, 102 S.Ct. at 280 (Stevens, J., concurring) ("But since the record discloses no danger that the University will *appear* to sponsor any particular religion, ... the Court properly concludes that the University's fear [of an Establishment Clause violation] is groundless.") (emphasis added).

Moreover, although the concurrence asserts that the endorsement test applies only to situations where "the government is speaking," Judge Kozinski, concurring, at 790, *Allegheny County* rejects such a narrow interpretation of the Establishment Clause. 492 U.S. at 600, 109 S.Ct. at 3104 ("[T]he Establishment Clause does not limit only the religious content of the government's own communications. It also prohibits the government's support and promotion of religious communications by religious organizations. Indeed, the *very* concept of 'endorsement' conveys the sense of promoting someone else's message." (citation omitted)). Accordingly, even though the creche in *Allegheny County* was owned and displayed by the Holy Name Society, a private Roman Catholic group, *id.* at 573, 109 S.Ct. at 3086, the Court found an Establishment Clause violation because observers were sufficiently likely to perceive the display as government endorsement of a religious message. *Id.* at 597, 601, 109 S.Ct. at 3103, 3105.

nature of a display's forum, however, "is simply a factor to be taken into account in determining whether the context of the display suggests government endorsement." *Kaplan*, 891 F.2d at 1029; *accord Smith*, 895 F.2d at 958 ("[W]hether the lawn is or is not a public forum is not dispositive. The critical gauge of any such content-related speech restriction is whether the overall context and nature of the restricted display conveys the impermissible message of governmental endorsement of religion." (footnote omitted)).

Thus the critical question remains whether San Diego's relationship with the Christmas Committee display violates the Establishment Clause. Having found an Establishment Clause violation, I conclude that a content-based injunction against the display does not offend the public forum doctrine. Holding the government to its obligations under the Establishment Clause constitutes a compelling state interest. Moreover, a prohibition limited to long-standing displays of solitary religious symbols on public property adjoining prominent city structures would be narrowly tailored to serve this interest. *See Smith*, 895 F.2d at 960; *Kaplan*, 891 F.2d at 1030. Accordingly, the Free Speech Clause is satisfied.

### B. *The Prior Restraint Doctrine.*

San Diego's licensing scheme regulating the use of long-term, unattended displays in Balboa Park is a prior restraint of speech. "[I]t is the sort of system in which an individual must apply for multiple licenses over time, or periodically renew a license." *Lakewood*, 486 U.S. at 759, 108 S.Ct. at 2145. A prior restraint of speech is not unconstitutional per se. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975). "Any system of prior restraint, however, 'comes to this [c]ourt bearing a heavy presumption against its constitutional validity.'" *Id.* (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)). Accordingly, San Diego's "licensing requirement is sufficiently threatening to invite judicial concern." *Lakewood*, 486 U.S. at 760, 108 S.Ct. at 2145.

The City's scheme for regulating long-term, unattended displays is an unconstitutional prior restraint of speech if it "vests unbridled discretion in a government official over whether to permit or deny expressive activity." *Id.* at 755, 108 S.Ct. at 2143; *see Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (invalidating ordinance allowing city to deny parade permit if city believed its public welfare, safety, health, morals, or convenience required denial). In determining whether unbridled discretion is present, we must examine both the nature of San Diego's permit policy and the articulation of that policy. The nature of the permit policy must be to provide "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth*, 394 U.S. at 151, 89 S.Ct. at 938. As to articulating the policy, "the limits the city claims are implicit in its law [must] be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood*, 486 U.S. at 770, 108 S.Ct. at 2151. Viewing the facts in the light most favorable to the City, I find that Kreisner is entitled to summary judgment because San Diego's permit policy is unconstitutional by nature. For the same reasons, I would reverse the City's summary judgment. Regarding the City's motion, I also find a triable issue of material fact as to whether San Diego has sufficiently articulated its permit policy.

### 1. *The Nature of San Diego's Permit Policy.*

Viewing the facts in the light most favorable to San Diego, the City's permit policy does not confine discretion. The City purports to take a "first-come, first-served" approach to issuing park permits. Further examination of the City's statements, however, reveals unwritten, unannounced embellishments to the policy: according to the district court's findings, which coincide with the City's assertions, the request to use the park must be "reasonable," the applicant must furnish "specifics" regarding the desired display, and the applicant must comply with the Park and Recreation Department's permit requirements. What is "reasonable"? What

are the requisite specifics? What permit requirements must be satisfied?

That a permit request be "reasonable" is itself an unconstitutional invitation of unbridled discretion. *See, e.g., Lakewood,* 486 U.S. 750, 108 S.Ct. 2138 (upholding facial challenge to ordinance giving mayor discretion to deny newsrack permit applications and authority to condition a permit on any terms deemed "necessary and reasonable"). Moreover, although park official Penny Scott stated that she would like to know specifics such as the size and construction material of proposed displays for planning purposes, *in* the end she apparently had the authority to deny an application when she felt "uncomfortable" with the request. Freedom from unbridled discretion over speech "has a firmer foundation than the whims or personal opinions of a local governing body." *Niemotko v. Maryland,* 340 U.S. 268, 272, 71 S.Ct. 325, 328, 95 L.Ed. 267 (1951). Finally, the City's permit requirements, which appear in the Rules and Regulations Governing Park Use Permits, contain nothing to restrain the *official's* discretion in deciding whether to grant a park permit. Rather, the regulations merely restrict the park *user* in the event the permit is granted. Thus, viewing the facts in the light most favorable to the City, San Diego does not provide "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth,* 394 U.S. at 151, 89 S.Ct. at 938.

Given the City's intimate involvement with the display over the past several decades and the rebuttable presumption that systems of prior restraint are unconstitutional, it was incumbent upon the City to craft and articulate a narrow, objective, and definite park permit policy. San Diego has failed to do so.

### 2. *San Diego's Failure to Articulate its Permit Policy.*

Even if San Diego's purported first-come, first-served policy with its accompanying embellishments were constitutional by nature, the policy must be evident in a binding text, judicial or administrative opinion, or a well-established practice. The City's permit policy for long-term, unattended displays is found in neither a binding text nor a judicial

or administrative opinion. Although the City contends that its policy is a matter of well-established practice, this fact is disputed. Accordingly, a triable issue of material fact is presented, and we should reverse the summary judgment for the City.

As for binding texts, San Diego admits in *its response to Kreisner's interrogatories* that there are no "documents which describe the official criteria and standards which are applied to applications for use of the [Balboa Park Organ Pavilion]." The district court on remand stated, and it is not disputed, that *beyond the Park and Recreation Department's fees and charges schedule,* "the City has not presented any evidence of a written policy regarding the issuance of permits." Findings at 4. The fees and charges schedule says nothing about the method or prerequisites for obtaining any kind of park permit. Moreover, neither the standard application form for obtaining a park permit nor the City's Rules and Regulations Governing Park Permits contains anything regarding the City's first-come, first-served policy or the specifics that applicants must furnish.

Furthermore, it is undisputed that no judicial or administrative opinion prescribes the City's permit policy. The majority takes comfort in the fact that future applicants can go to court if the City fails to follow its purported permit policy so that, in effect, future judicial opinions will circumscribe the City's discretion. Opinion at 786, n. 7. The Supreme Court, however, has stated explicitly that "[e]ven if judicial review [of a denied permit] were relatively speedy, such review cannot substitute for concrete standards to guide the decisionmaker's discretion." *Lakewood,* 486 U.S. at 771, 108 S.Ct. at 2151. Indeed, it is the *potential* for government abuse of discretion, rather than the abuse itself, that is so pernicious:

> Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas.... It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion.

*Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940).

The City relies upon the idea that its permit policy is articulated via a well-established practice. Assuming the facts as presented by Kreisner, however, neither the patrons of Balboa Park nor park officials themselves seem familiar with any such practice. Betty Wheeler of the ACLU decided to test the City's purported policy precisely because neither she nor her colleagues who regularly worked with people participating in expressive activities in San Diego had ever heard of such a policy. Jack Krasovich, the Deputy Director of San Diego's Park and Recreation Department, was unsure of what type of permit a long-term, unattended display could receive. He testified at various points that unattended displays are granted "park facility use" permits, "park use" permits, and "special use" permits. Penny Scott, the District Manager for Balboa Park, had never heard of a "non-exclusive use" permit, which was the term that the City Attorney used at oral argument to describe what permit category suited a long-term, unattended display.

In fact, the City's well-established practice seems to negate its claim to a strict first-come, first-served permit policy. As noted earlier, according to the ACLU's version of its experience with the City, Scott stated that the Christmas Committee display was a tradition and that it would be in the Organ Pavilion until the Committee decided not to erect the display again. Moreover, despite the City's co-sponsorship and intimate involvement with the holiday display for 35 of the last 39 years, the City Council has not explicitly articulated its permit policy for long-term, unattended displays. This undermines its claim of having a well-established first-come, first-served policy.

Kreisner's account of the City's rejecting the ACLU's permit application for the proposed Bill of Rights display demonstrates the dangers inherent in giving government officials unbridled discretion over speech. Among the risks that the prior restraint doctrine seeks to minimize are government censorship, self-censorship by speakers, and the unreviewability of constitutional challenges to licensing schemes. *Lakewood,* 486 U.S. at 757–59, 108 S.Ct. at 2144–45. All three risks are present here.

First, the prohibition of unbridled discretion is designed to control government censorship of speech. *Id.* at 757, 108 S.Ct. at 2144; *Southeastern Promotions, Ltd.,* 420 U.S. at 559, 95 S.Ct. at 1246. There is evidence that San Diego censored speech based on content when it gave priority to the Christmas Committee display over the ACLU's proposed display. Scott's references to the Christmas Committee display as "tradition," her comment that the display was "already booked" when it was not, and her statement that the display "will be there every year until they [the Christmas Committee] decide not to do it again" all suggest the type of censorship that runs amuck over the First Amendment. That Scott offered the ACLU an alternative location for its proposed display does not absolve the City of constitutional liability. *Southeastern Promotions, Ltd.,* 420 U.S. at 556, 95 S.Ct. at 1245 (" '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' ") (quoting *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939)).

Second, the City's unwritten, unannounced permit policy raises the possibility that would-be sponsors of long-term, unattended displays in Organ Pavilion at Christmas time are censoring themselves. This is a constitutionally significant concern. "[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Lakewood,* 486 U.S. at 757, 108 S.Ct. at 2144. Many people may not be aware that they can apply for a permit to occupy the area of the Christmas display during December because written standards are absent. The reasonable San Diegan who has seen the Christmas display for decades is probably unaware that one can display something at that site upon submitting a permit application.

Finally, San Diego's invisible permit criteria make this case difficult to review. These

circumstances have troubled the Supreme Court:

> [T]he absence of express standards makes it difficult to distinguish ... between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*Id.* at 758, 108 S.Ct. at 2144. An unwritten, unannounced permit policy with ad hoc embellishments does not provide the concrete standards necessary to ensure sound judicial review of claims alleging First Amendment violations.

At bottom,

> [i]n the instant case we are met with no ordinance or statute regulating ... the use of the park; all that is here is an amorphous 'practice,' whereby all authority to grant permits for the use of the park is in the Park Commissioner and the City Council. No standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power; no substantial interest of the community to be served. It is clear that all that has been said about the invalidity of such limitless discretion must be equally applicable here.

*Niemotko,* 340 U.S. at 271–72, 71 S.Ct. at 327; *see also Kunz v. New York,* 340 U.S. 290, 293, 71 S.Ct. 312, 314, 95 L.Ed. 280 (1951) (ordinance requiring those who wished to hold public worship meetings on the streets to obtain permit from police commissioner gave "administrative official discretionary power to control in advance the right of citizens to speak on religious matters on the streets of New York ... [and therefore was] clearly invalid as a prior restraint on the exercise of First Amendment rights").

## CONCLUSION

"The lessons of the First Amendment are as urgent in the modern world as in the 18th Century when it was written. One timeless lesson is that if citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee,* —— U.S. at ——, 112 S.Ct. at 2658. Given the undisputed facts, San Diego's interrelationship with this religious display of literally biblical proportions violates the Establishment Clause. Moreover, its unwritten, unannounced policy for administering park permits offends the Free Speech Clause. Therefore, I would hold that Kreisner is entitled to summary judgment on these grounds and would reverse the summary judgment for the City.

Furthermore, there is a triable issue under both the Establishment and Free Speech Clauses as to whether San Diego in fact favored the Christmas Committee over another, first-in-time permit applicant. Accordingly, I would reverse San Diego's summary judgment for this additional reason.